# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### FEBRUARY 1998 SESSION



FILED

October 13, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| Appellee, | ) | C.C.A. No. 01C01-9610-CC-00448 |
| | ) | |
| vs. | ) | Warren County |
| | ) | |
| **GEORGE BLAKE KELLY,** | ) | Hon. Charles Haston, Judge |
| | ) | |
| Appellant. | ) | (Second Degree Murder, Vehicular |
| | ) | Assault, Reckless Driving, DUI - 3d, |
| | ) | Driving on Revoked License) |

FOR THE APPELLANT:

**DAVID L. RAYBIN** (on appeal)
Attorney at Law
2210 SunTrust Center
424 Church St.
Nashville, TN  37219

**BERNARD K. SMITH** (at trial)
Attorney at Law
P.O. Box 490
McMinnville, TN  37110

**JOHN MELTON** (at trial)
Attorney at Law
P.O. Box 446
Woodbury, TN  37190-0160

FOR THE APPELLEE:

**JOHN KNOX WALKUP**
Attorney General & Reporter

**KAREN YACUZZO**
Asst. Attorney General
425 Fifth Ave. North
2d Floor, Cordell Hull Bldg.
Nashville, TN  37243-0493

**WILLIAM M. LOCKE**
District Attorney General

**LARRY ROSS**
**ROBERT W. BOYD, JR.**
Asst. District Attorneys General
Professional Building
McMinnville, TN  37110

OPINION FILED:_____

**AFFIRMED IN PART, REVERSED IN PART, MODIFIED IN PART**

**CURWOOD WITT, JUDGE**

## OPINION

The defendant, George Blake Kelly, appeals from his convictions of second-degree murder, vehicular assault, reckless driving, third-offense driving under the influence, and driving on a revoked license. Following a trial by jury, Kelly was found guilty of second-degree murder, vehicular homicide by intoxication, vehicular homicide by recklessness, vehicular assault by intoxication, reckless driving and third-offense DUI. He pleaded guilty to driving on a revoked license before the issue was submitted to the jury. The court imposed judgments of conviction for second-degree murder, vehicular assault, reckless driving, third-offense DUI and driving on a revoked license. Kelly is presently serving a sentence of 30 years, 11 months and 29 days, which consists of the maximum sentences for each of his offenses stacked consecutively to each other. In this direct appeal, he raises ten issues for our consideration:

1. Whether the evidence on his second-degree murder conviction sufficiently supports that he "knowingly" killed Ginny Prince.

2. Whether the Criminal Code proscribes death caused by drunk driving as second-degree murder.

3. Whether the trial court erroneously instructed the jury on the definition of "knowingly" as to the second-degree murder charge.

4. Whether the trial court erroneously instructed the jury on the definition of "intentionally" as to the second-degree murder charge.

5. Whether the trial court deprived him of due process of law and the right to a jury trial by instructing the jury it could convict him of both second-degree murder and vehicular homicide as to the same victim.

6. Whether the DUI conviction merged with the vehicular assault by intoxication and vehicular homicide by intoxication convictions, double jeopardy principles thereby preventing his conviction of DUI.

7. Whether the reckless driving conviction merged with the vehicular assault by intoxication, vehicular homicide by recklessness, and vehicular homicide by intoxication convictions, double jeopardy principles thereby preventing his conviction of reckless driving.

**2**

8. Whether the court in sentencing the defendant relied on improper enhancement factors and failed to consider appropriate mitigating factors.

9. Whether the court properly imposed consecutive sentences.

10. Whether the total sentence imposed is grossly excessive and resulted from improper considerations of parole, the adequacy of punishment for vehicular homicide, and emotional factors.

Having reviewed the record and briefs and heard the oral arguments of the parties, we reverse the conviction of second-degree murder and impose a conviction of the lesser grade offense of vehicular homicide by intoxication, reverse the convictions of driving under the influence and reckless driving and dismiss those charges, and affirm all other convictions. We modify defendant's effective sentences to ten years and six months. Because our reversal of the second-degree murder conviction is based upon insufficiency of evidence, resulting in a dismissal of the second-degree murder charge, issues 2-5 as listed above are pre-empted, rendered moot, and need not be resolved.

This case arises from a tragic car wreck involving the defendant and the occupants of another vehicle, Ginny Prince and David Bryan Miller. Miss Prince, an eighteen-year-old high school senior, was killed in the wreck. Mr. Miller, a twenty-year-old real estate salesman, received very serious and permanent injuries. Miss Prince and Mr. Miller were returning to McMinnville from a date in Murfreesboro when their vehicle was struck head-on in their lane of traffic by the defendant's vehicle.

For some time prior to April 7, 1995, George Blake Kelly and his wife at the time, Lisa Kelly, were experiencing marital difficulties. According to Lisa Kelly, she and the defendant had been separated three times. However, on April 7, 1995, they were living together in Readyville, Tennessee, in order to give the

3

relationship one last chance. That morning, Lisa Kelly left home to go to a tanning bed. She returned and found the defendant and their infant child gone. The defendant left Mrs. Kelly a note informing her that he had gone to see his attorney. This made Mrs. Kelly mad, and she departed for Dunlap, Tennessee. Mrs. Kelly met with a relative and some friends and went to a tavern in Whitwell, Tennessee, where she drank and socialized. Around 1:30 a.m., Mrs. Kelly departed Dunlap to return home. On her way home, Mrs. Kelly was involved in a single-car accident. The law enforcement officer who responded to her wreck informed her of a wreck in which the defendant had been involved.

Mrs. Kelly testified that the defendant told her he had five or six beers on April 7, 1995. He came up on a vehicle that was traveling very slowly. When he began passing the vehicle, it sped up. He could not get back on the right side of the road and avoid the wreck.

Anita Morton, a resident of Dunlap, testified the defendant stopped by her house about 7:00 p.m. on April 7. He had a beer bottle with him. He stayed at Ms. Morton's residence for about 45 minutes. The defendant and Ms. Morton had a tearful discussion of their respective relationship problems. They also discussed Mrs. Kelly's alleged infidelity. The defendant appeared to be more distraught than drunk to Ms. Morton. She denied having previously characterized the defendant as "drunk" or "pretty drunk." Shortly after the defendant went outside to leave, he returned to Ms. Morton's door and asked for some paper towels to clean up some beer he had spilled in his vehicle. Ms. Morton saw the defendant with only one beer during his visit. She also testified she had known Mrs. Kelly for a long time and would not believe Mrs. Kelly's sworn testimony.

Sue Lewis, another Dunlap resident, testified she was an employee

4

of Steve's Place, a tavern. On April 7, the defendant came to this establishment at about 4:00 or 4:30 p.m. The defendant had a can of Miller Lite beer in his hand. He asked to see Steve Robertson. Mr. Robertson and the defendant went outside, and Ms. Lewis did not hear what was said. The defendant returned to Steve's Place around 6:30 or 7:00 that evening. He had a cup of beer in his hand. Ms. Lewis observed that the defendant was agitated. The defendant said that Mr. Robertson had lied to him and began asking Ms. Lewis questions in a loud tone of voice. Apparently, the defendant believed Mr. Robertson was having a romantic relationship with Lisa Kelly. The defendant requested "beer to go" but Ms. Lewis refused to serve him. She told him that he had had one too many. When Mr. Robertson arrived, he and the defendant went outside. Ms. Lewis testified the defendant left Steve's Place around 7:00 p.m.

Steven Robertson testified he runs Steve's Place. On April 7, the defendant came to this establishment about 4:00 p.m. looking for his wife. Mr. Robertson and the defendant went outside to talk, and the defendant wanted Mr. Robertson to "testify or something" in the defendant's divorce proceedings. Mr. Robertson told the defendant he had seen Lisa Kelly the previous week at Ruby's, another tavern. Mrs. Kelly had been with Bob Green. Although the defendant had a beer with him, Mr. Robertson did not think he was under the influence. Mr. Robertson did not serve Mr. Kelly anything to drink.

Mr. Robertson further testified that he saw the defendant a second time at Steve's Place that evening. When Mr. Robertson came in the back door around 7:00 p.m., Ms. Lewis told him that the defendant had returned and was asking questions and accusing Mr. Robertson of having lied to him. Both Ms. Lewis and the defendant were upset. The defendant had a cup in his hand and had been drinking. Mr. Robertson did not sell him any beer.

5

Mr. Robertson also testified that Lisa Kelly had taken a jacket containing $1,800 from Steve's Place.[1]

David Bryan Miller, one of the two victims, testified that he and Ginny Prince, the other victim, had been dating for two years and were planning to marry. They had been to O'Charley's to celebrate his having closed a sale on a house and to the Outlets Limited Mall in Murfreesboro. They left the mall about 8:30 and were headed toward Miss Prince's home in McMinnville. They were in Miss Prince's car, and Mr. Miller was driving. They were traveling 50 to 55 miles per hour about 9:15 to 9:25 p.m, when suddenly the defendant's vehicle appeared in their lane of traffic and hit their vehicle head-on. The collision occurred at a curve in the road. Mr. Miller testified he could do nothing to avoid it.

Mr. Miller testified he sustained torn ligaments and tendons in his ankle, a broken bone beneath his knee, three fractured ribs, a dislocated hip which required surgery, heavy facial lacerations requiring 1,100 stitches, and a torn retina. He had fourteen staples in his head and permanent vision loss in his right eye. He was hospitalized for a week and confined to bed for another eight to nine weeks.

Bobby Joe Perry testified he was traveling west on the road where the collision occurred. He was on his way home from choir practice. He was going about 50 miles per hour with no one ahead of him in his lane of traffic. The defendant's vehicle came up behind him and got so close that he could not see its headlights behind his tailgate. The defendant's vehicle pulled out to pass about 125 to 150 yards before a curve. The road was marked with double yellow lines; however, there was a break in the lines for an intersection at the point where the

---

[1]During her testimony, Lisa Kelly denied taking this money.

defendant started to pass Mr. Perry. The defendant's vehicle passed him and started back toward the right lane but the driver's side wheels never crossed the yellow line. The headlights of the victims' vehicle had appeared as the defendant started passing Mr. Perry. As the defendant's and victims' headlights met on the curve, the defendant veered to the left into the path of the victims' car. At the point the vehicles collided, the defendant's vehicle was four to four and one half car lengths in front of Mr. Perry. The witness testified he had a clear view and never saw any brake lights on the defendant's vehicle. After the wreck, Mr. Perry went to check on the occupants of both vehicles. When he stuck his head in the defendant's vehicle, he smelled alcohol. He also observed two empty beer cans in the road. The defendant's vehicle was full of clothing and other personal items.

Christie Lynn Myers, a licensed practical nurse, was traveling on the road where the wreck occurred. She stopped to assist the injured. She observed that Miss Prince was dead and Mr. Miller was in pain. The defendant was slumped over his steering wheel and smelled of alcohol. The defendant was breathing on her, and the smell was coming from him rather than his vehicle. She observed a few Budweiser cans inside and outside the defendant's vehicle. One can was in the defendant's lap, one was on the floor, another was in the seat, and a couple were outside.

Nicholas Joseph Abraham, an emergency medical technician, responded to the scene. The defendant was unresponsive at first, but he became responsive once Mr. Abraham opened up his airway. The defendant wanted to know where his wife was and had no idea he had been involved in an accident. He became combative and screamed for Mrs. Kelly. He would not, however, respond to the emergency personnel's questions. Mr. Kelly suffered a head injury, and his actions were similar to other individuals who have sustained head injuries. Mr.

Abraham drew a blood sample for blood alcohol testing at the request of a state trooper on the scene. Mr. Abraham did not notice a smell of alcohol on Mr. Kelly, although he did not think he would have smelled alcohol because of the automotive fluids that had been spilled from the wreck.

Trooper Jimmy Jones arrived after the defendant had been extricated from his vehicle, but he noticed the smell of alcohol around the defendant's vehicle. He saw a Budweiser can in the vehicle, two in the ditch, and two lying in the road near the double yellow line. One of the cans in the road may have been full until it was run over by an ambulance. The trooper went to the ambulance where the defendant was being treated and smelled alcohol on him. During his testimony, a videotape of the wreck scene recorded from the trooper's patrol car was played for the jury, and the witness narrated its contents. His narration included the existence of a double yellow "no passing" line on the roadway which had a short 20' to 25' break at an intersection with another street.

Robert Searcy, an on-duty fireman and off-duty officer of the Warren County Sheriff's Department, responded to the scene. He observed Mr. Miller in "extreme pain." He assisted Mr. Kelly's breathing with a bag mask device. Mr. Kelly had a head injury and was going into shock. He noticed a strong odor of alcohol

**8**

coming from Mr. Kelly.

Trooper Michael Jones was the first trooper on the scene at about 9:55 p.m. He had to physically restrain the defendant so Mr. Abraham could render medical assistance. The defendant was "screaming for Lisa" and "thrashing around." He did not smell any alcohol on the defendant, but the trooper thought his sense of smell was adversely affected by his smoking habit. Billy George gave him the defendant's wallet, and he took a driver's license from it. He ran a check of the license and discovered it had been revoked. The witness conceded that the defendant's behavior was similar to that of other individuals with head injuries and in shock, although it was more pronounced than in any other case the witness had ever seen. The trooper admitted he was not an emergency medical technician, but he had been a medical specialist in the Army.

Lieutenant Randy Hoover, an accident reconstructionist with the Tennessee Highway Patrol, investigated the wreck. In his opinion, the defendant's vehicle, a Jimmy, was going faster than the victims' Probe. The vehicles collided in head-on fashion with about 50 percent overlap in the eastbound lane. The Probe was knocked backwards in a counterclockwise direction, and the Jimmy continued forward in a clockwise direction. The Jimmy was partially on top of the Probe just after impact and may have been airborne for a very short time before turning onto and sliding on its side. One of the two vehicles was "cutting its wheels," but Lt. Hoover could not opine which one.

Raymond Siler, Jr., a crime lab supervisor with the Tennessee Bureau of Investigation, tested the defendant's blood sample for alcohol content. The blood alcohol content result was 0.28 percent.

**9**

The parties stipulated that if called to testify, Dr. David N. Jones would say that Ginny Prince suffered multiple trauma injuries in the wreck that proximately resulted in her death.

Venita Spearman, a secretary at McMinnville Garage and Wrecker Service, testified that her employer towed the defendant's vehicle and kept it in a secure, fenced back lot. The defendant told Ms. Spearman that he drank approximately a six-pack of beer on an empty stomach on the day of the wreck. He said all he remembered was two headlights coming toward him, and he admitted he was at fault for drinking and driving. He told Ms. Spearman he was not driving around looking for a car to hit, and he wished he could say something to "the family."

Billy Cook, the director of the Drug and Violent Crime Task Force, met with the defendant in a chapel at the Warren County Sheriff's office. Mr. Cook advised the defendant of his rights. Thereafter, the defendant proceeded to tell Mr. Cook that he should not have "let my drinking get hold of me." The defendant was upset because his wife had been "running around on him," and he had been looking for her on the evening of the wreck. Mr. Cook recalled the defendant saying he drank six to eight beers and had not eaten all day. He had passed a vehicle and thought it sped up. He was beside the vehicle, and before he knew it he was in a curve. He felt the driver of the vehicle he was attempting to pass was as much at fault as he was.

Following the conclusion of the state's proof, the defendant changed his plea for the charge of driving on a revoked license from not guilty to guilty.

The defense presented no evidence.

**10**

The jury found the defendant guilty of second-degree murder of Ginny Prince, vehicular homicide of Ginny Prince by intoxication, vehicular homicide of Ginny Prince by recklessness, vehicular assault of David Miller by intoxication, reckless driving and third-offense DUI. The court entered convictions of second-degree murder, vehicular assault, reckless driving, third-offense DUI and driving on a revoked license.

Following a sentencing hearing, the trial court imposed maximum sentences of 25 years for second-degree murder, four years for vehicular assault, six months for reckless driving, eleven months and 29 days for third-offense DUI,[2] and six months for driving on a revoked license. The court further found consecutive sentencing was appropriate and imposed each conviction consecutive to each other, for an effective sentence of 30 years, eleven months and 29 days.

I

The first issue we must consider is whether the evidence is sufficient to sustain the defendant's conviction of second-degree murder. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence.

---

[2]According to the transcript, the trial court imposed a minimum fine of $1,100 and revoked the defendant's driver's license for ten years for the third-offense DUI conviction. The judgment form reflects a fine of only $1,000. In light of our dismissal of the DUI conviction on double jeopardy grounds, it is moot whether the $1,000 or $1,100 fine is correct.

State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990).

In determining the sufficiency of the evidence, this court should not reweigh or reevaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); Farmer v. State, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). On the contrary, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. Cabbage, 571 S.W.2d at 835.

The relevant definition of second-degree murder is the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (1991). The defendant claims the evidence is insufficient to support the conclusion he knowingly killed Ginny Prince. He argues that murder is a crime defined by its results; therefore, the state must prove that he knew a killing would result from his conduct. On the other hand, the state argues that the proof shows that the killing was knowing,[3] and further, that the relevant inquiry is not solely into defendant's mental state with respect to result of the his actions but alternatively into his mental state with respect to his conduct. Thus, the state argues, if he knowingly or intentionally drank and drove, he is guilty of second-degree murder for the result of the unlawful drinking and driving.

---

[3]In its brief, the state argued that a basis for an intentional, and hence a knowing, killing exists in that the defendant was attempting suicide and intentionally caused the collision. However, during oral argument, the state abandoned this theory.

We find insufficient evidence of a knowing killing to sustain the defendant's conviction of second-degree murder.

Under our Criminal Code, murder is an offense defined by the result, not by the offender's conduct or by the circumstances surrounding the conduct. See, e.g., State v. Freeman, 943 S.W.2d 25, 29 (Tenn. Crim. App. 1996), perm. app. denied (Tenn. 1997). "A person acts knowingly with respect to a result of a person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b) (1997). Thus, to establish second-degree murder, the state must prove that the defendant was "aware that the conduct is reasonably certain" to cause death.

In a case of this type, the offending activity may arguably occur at a given point in a sequence of events or along a continuum of time. A reviewing court must determine during which event or at what point in time the critical "conduct" occurred. The state would have us choose an event or time very early in the sequence -- that is, when the intoxicated defendant began to drive his vehicle in violation of the DUI laws. Certainly, under the pre-1989 Code, this theory would support a finding of implied malice which was the underpinning for a long line of Tennessee cases which, before 1989, approved second-degree murder convictions in vehicular-homicide situations. See, e.g., State v. Durham, 614 S.W.2d 815 (Tenn. Crim. App. 1981). Malice was implied from the defendant's decision to drive a motor vehicle while intoxicated. Under the pre-1989 law, the facts of this case would have demonstrated actions which are malum in se and which evince "willful recklessness," State v. Johnson, 541 S.W.2d 417 (Tenn. 1976), and, as such, they would have supported a finding of implied malice which, in turn, would have authorized a conviction for second-degree murder. However, the 1989 Criminal Code removed malice as an element of murder, relegated the old implied-malice

**13**

formula to crimes proscribing killings resulting from reckless conduct, see Tenn. Code Ann. § 39-13-210(a)(1) (1991), and inserted the mens rea of a knowing killing as an element of second-degree murder. Moreover, as we have said, it is not conduct, but a result, that is proscribed by the current second-degree murder statute. Therefore, for purposes of second-degree murder, we must reject the argument that the critical time for judging the defendant's actions is when he climbed behind the wheel of his vehicle.

Alternatively, the state suggests that the critical time for judging the defendant's conduct is the point in time after he passed the Perry vehicle when, instead of returning to his lane of travel, he veered left, further into the path of the victims' car. Mr. Perry is the only witness to this movement of the defendant's vehicle, and we have examined carefully his testimony. We do not find that this testimony provides meaningful evidence of the defendant's knowledge, awareness or intent at that point in time. The perceived veering of the defendant's truck could have been an evasive maneuver, and moreover, in light of the defendant's blood alcohol content of .28 percent, his full consciousness at the critical time is arguably in doubt. We believe that the critical conduct for which the defendant must be judged occurred prior to the instant just before the collision.

The critical conduct occurred when the intoxicated defendant passed another vehicle on a curve in a no-passing zone and his presence in the opposing

lane of traffic became irreversible. As such, the record is devoid of any proof of the defendant's knowledge that death was reasonably certain to result before the events were irretrievably set into motion by this conduct. The defendant's outrageously reckless conduct is analogous to a person firing a pistol from inside a windowless building out through the open doorway. The person cannot see whether someone may be walking outside along the front of the building, about to pass the doorway, and he knows of no one present outside. The "conduct" is commenced by the firing of the weapon and must be judged at that time because the conduct is then irreversible. Under our Criminal Code, such conduct is, as is the conduct in the present case, reckless. This reckless conduct, however egregious, is distinguishable from a hypothesis where the person is firing the pistol through the doorway when he is aware that a moving line of people is filing in close order past the open door. In that hypothesis, death is reasonably certain to result from the conduct, even <u>before</u> the bullet is fired, such that a death resulting from the shot is, at least, knowing. As seen in this analogy, the facts in the present case do not support a finding of a knowing killing which is necessary to a conviction of second-degree murder.

The case at bar presents an egregious picture of an individual who drove while intoxicated and after his driver's license had been revoked. He drove with his vehicle full of personal belongings, which may have impaired his ability to see out of the right side of the vehicle. He attempted to pass a vehicle in a no-passing zone. Tragically, the defendant's blatant, unjustifiable disregard for the rules of the road and the safety of others resulted in the death of a young woman and the permanent bodily injury of a young man. Nonetheless, the facts when viewed in the light most favorable to the state do not support a conclusion beyond a reasonable doubt that he was aware that his actions were reasonably certain to cause the victim's death. <u>See</u> Tenn. Code Ann. § 39-11-302(b) (1997). On the

**15**

other hand, however, the defendant's conduct was clearly reckless, and, as he concedes, he is guilty of the crime of vehicular homicide.

This court is mindful that the offenses in the present case were committed during a time period in which the legislature's grading of vehicular-homicide-type offenses was viewed by many as inadequate. Prior to the enactment of the 1989 Criminal Code, as we have observed, murder was predicated upon the element of malice, and second-degree murder could be established by proof of implied malice. See State v. Moss, 727 S.W.2d 229 (Tenn. 1986); State v. Johnson, 541 S.W.2d 417 (Tenn. 1976); Griffin v. State, 578 S.W.2d 654 (Tenn. Crim. App. 1978). On the other hand, the offenses in the present case were committed before the legislature upgraded the penalty for vehicular homicide committed by DUI. At the time of the defendant's crime, vehicular homicide was a Class C felony. See Tenn. Code Ann. § 39-13-213(b) (1991) (amended 1995). Vehicular homicide by intoxication has since been elevated to a Class B felony. See Tenn. Code Ann. § 39-13-213(b) (1997). Moreover, the legislature has created the Class A felony of aggravated vehicular homicide. The "aggravation" of vehicular homicide results either from the defendant's previous conviction of enumerated driving and/or alcohol-related offenses or a combination of a .20% or greater blood alcohol content and conviction of at least one enumerated driving or alcohol-related offense. See Tenn. Code Ann. § 39-13-218 (1997). Thus, the defendant's crime, if committed today under the same circumstances and by the same individual, would be subject to prosecution as aggravated vehicular homicide, which is in the same sentencing class as second-degree murder. Compare Tenn. Code Ann. § 39-13-218(d) (1997) (aggravated vehicular homicide is Class A felony) with § 39-13-210(b) (1997) (second-degree murder is Class A felony).

As senseless as the defendant's crimes are, we are constrained to

**16**

follow the dictates of and observe the limitations imposed by the legislature. Given the legislature's substitution of a "knowing" killing in place of malice as the basis for second-degree murder, and our finding that the facts in the present case, even in the light most favorable to the state, do not support a knowing killing, we are bound to reverse the second-degree murder conviction, even though such a reversal relegates this offense to a gradation of vehicular homicide which the legislature has recently decided was inadequately sanctioned at the time the defendant committed the crime.

In accord with the relevant law, we modify the defendant's conviction for second-degree murder to a conviction of vehicular homicide by intoxication.

## II

Next, we turn to the defendant's claims that double jeopardy principles prevent his conviction of DUI and reckless driving because these crimes should have been merged with certain of his other convictions. In response, the state concedes the impropriety of these dual convictions. Applying the principles of State v. Denton, 938 S.W.2d 373 (Tenn. 1996), we reach the same conclusion and therefore must reverse and dismiss the DUI and reckless driving convictions.

The state and federal constitutions protect against multiple convictions or punishments for a single offense. U.S. Const. amend. V; Tenn. Const. art. 1, § 10. In order for offenses to support multiple convictions, they must be "wholly separate and distinct." See, e.g., State v. Goins, 705 S.W.2d 648, 650 (Tenn. 1986) (citations omitted). In State v. Denton, our supreme court recognized that "[t]he key issue in multiple punishment cases is legislative intent." Denton, 938 S.W.2d at 379 (citations omitted). In other words, the court must determine whether the legislature intended that each violation resulting from a single act be a separate

**17**

offense. Presumptively, "the legislature does not ordinarily intend to punish the same offense under two different statutes." Denton, 938 S.W.2d at 379.

The Denton court employed a four-part balancing inquiry in determining whether multiple convictions offend double jeopardy. Denton, 938 S.W.2d at 379-81. First, the court must determine, in accord with Blockburger v. United States, 284 U.S. 299, 52 S. Ct. 180 (1932), whether each offense requires proof of an element that the other does not. Denton, 938 S.W.2d at 379. Second, the court must look to the specific evidence offered in the case at bar to determine whether the different evidence was used to prove each offense. Denton, 938 S.W.2d at 380 (relying on Duchac v. State, 505 S.W.2d 237 (Tenn. 1973)). Third, the court must consider whether there were multiple victims or multiple episodes. Denton, 938 S.W.2d at 381. Fourth, the court must examine the purposes of the respective statutes prohibiting the defendant's conduct and determine whether the statutes serve different purposes. Denton, 938 S.W.2d at 381. None of these four inquiries is determinative; rather, the court must conduct a balancing test of each factor in relation to each other. Denton, 938 S.W.2d at 381.

In the case at bar, we have conducted the Denton inquiry, first, with respect to the crime of DUI, as compared with vehicular assault and vehicular homicide. We conclude that double jeopardy will not permit the DUI conviction to stand. Accord State v. Rhodes, 917 S.W.2d 708 (Tenn. Crim. App. 1995) (double jeopardy prevents convictions for both vehicular assault by intoxication and DUI), perm. app. denied (Tenn. 1996). Comparison reveals that the crimes fail the Blockburger separate elements test.[4] The evidence essential to the vehicular

---

[4]The defendant was convicted both of vehicular homicide by intoxication and vehicular homicide by recklessness. He can receive only one conviction for this crime. We believe Denton clearly prohibits a conviction for both DUI and vehicular homicide by intoxication in the case at bar. Alternatively, had we

**18**

homicide by intoxication conviction is inclusive of the evidence necessary to prove DUI.[5] Likewise, the evidence essential to the vehicular assault conviction is inclusive of the evidence necessary to prove DUI. While it is true there are multiple victims in this case, proof of a victim is not necessary for a conviction of DUI. The relevant inquiry in the case at bar is whether there were multiple episodes, and there were not. The defendant was involved in only one collision. Finally, the purposes of the three statutes are similar. The vehicular assault and vehicular homicide statutes have the obvious goal of proscribing bodily injury to a victim and punishing those who commit such an act,[6] and the similar aim of the DUI statute is to "remove from the highways, prosecute and punish those who engage in the dangerous menace of driving under the influence." State v. Turner, 913 S.W.2d 158, 160 (Tenn. 1995); see also State v. Lawrence, 849 S.W.2d 761, 765-66 (Tenn. 1993).

Second, we have conducted a Denton inquiry with respect to the defendant's reckless driving conviction, as compared with his vehicular assault and vehicular homicide convictions. We conclude that double jeopardy bars his conviction of reckless driving. The reckless driving conviction fails the Blockburger separate elements test with respect to both vehicular assault and vehicular

---

permitted the defendant's vehicular homicide by recklessness conviction to stand, the DUI conviction would nevertheless violate double jeopardy principles in light of the vehicular assault by intoxication conviction.

[5]Although there is evidence the defendant drove while under the influence prior to encountering the victims, this court has said that DUI is a "continuing offense." See State v. Rhodes, 917 S.W.2d 708, 713 (Tenn. Crim. App. 1995); State v. Adkins, 619 S.W.2d 147, 148-49 (Tenn. Crim. App. 1981). Accordingly, in the usual circumstance, a continuing episode of drunken driving will support only one DUI conviction.

[6]Tenn. Code Ann. § 39-13-213 (1991) (amended 1995); § 39-13-106 (1997).

homicide.[7]  In the case at bar, the evidence used to prove the defendant's commission of the offense of reckless driving was part of the evidence also used to convict the defendant of vehicular assault and vehicular homicide. The state proved one episode of reckless driving in this case, and that episode is the foundation for all three convictions under scrutiny. See State v. Gilboy, 857 S.W.2d 884, 887 (Tenn. Crim. App. 1993) ("[A]n act of driving which disregards the safety of several distinct persons or properties still constitutes one offense of reckless driving under the statute."). But cf. State v. Adkins, 619 S.W.2d 147, 149 (Tenn. Crim. App. 1981) (reckless driving is not a continuing offense).  Finally, we see a common purpose in the reckless driving, vehicular assault and vehicular homicide statutes. All three proscribe and punish reckless driving.

Thus, as argued by the defendant and conceded by the state, double jeopardy principles mandate that we reverse and dismiss the convictions of DUI and reckless driving.

III

Finally, we address the defendant's sentencing issues. The defendant complains of improper consideration of enhancement and mitigating factors, the weight afforded those factors, the imposition of consecutive sentences, and the total length of the effective sentence. In determining whether the trial court has properly sentenced an individual, this court engages in a de novo review of the record with a presumption that the trial court's determinations were correct. Tenn. Code Ann. § 40-35-401(d) (1997). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn.

---

[7]Both vehicular homicide by recklessness and vehicular homicide by intoxication require reckless operation of a motor vehicle.

**20**

1991). In conducting our de novo review, we must consider the evidence at sentencing, the presentence report, the sentencing principles, the arguments of counsel, the statements of the defendant, the nature and characteristics of the offense, any mitigating and enhancement factors, and the defendant's amenability to rehabilitation. Tenn. Code Ann. §§ 40-35-210(b), 40-35-103(5) (1997); Ashby, 823 S.W.2d at 168. On appeal, the appellant has the burden of showing that the sentence imposed is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Comm'n Comments (1997); Ashby, 823 S.W.2d at 169.

In the case at bar, the record reflects that the trial court announced its contemplation of the statutory considerations. Unfortunately, however, the trial court made comments on the record which indicate extraneous factors were considered in determining the appropriate sentence.[8] Accordingly, we conduct a de novo review without the presumption of correctness. We will consider, first, the length of the defendant's individual sentences, and second, the propriety of consecutive sentencing.

Additionally, in the interest of judicial economy, we have determined the appropriate sentence for the defendant's modified conviction of vehicular homicide. See State v. Angela Manning, No. 03C01-9501-CR-00012, slip op. at 27 (Tenn. Crim. App., Knoxville, Feb. 27, 1998) (remand for sentencing on modified conviction unnecessary if record is sufficient for appellate court to impose an

---

[8]The trial judge expressed his dissatisfaction with the legal authority applicable to the defendant, including his dissatisfaction with the sentencing structure and the applicability of parole provisions. The judge did say, however, that he could not consider these things in making his sentencing determination. Notwithstanding, he went on to characterize the defendant as being like the inventor of V-1 and V-2 rockets, who indirectly caused the deaths of thousands during World War II. Having carefully reviewed the entire transcript of the sentencing hearing, we view the character and duration of the trial judge's comments as a departure from the relevant considerations of the Sentencing Reform Act of 1989.

**21**

appropriate sentence).

## A

The defendant reaches the sentencing determination with three convictions -- vehicular homicide of Ginny Prince, vehicular assault of David Miller, and driving on a revoked license. We consider first the enhancement factors applicable to these convictions.

The defendant concedes he has a previous history of criminal convictions and criminal behavior. See Tenn. Code Ann. § 40-35-114(1) (1997). This factor is entitled to great weight given the defendant's history of recent DUI convictions and other evidence of drinking and driving presented at the sentencing hearing.

We believe factor (6) applies. Tenn. Code Ann. § 40-35-114(6) (1997) (personal injuries or property damage caused was particularly great). However, to the extent that the trial court applied this factor in the vehicular assault case based on the injuries to Mr. Miller, it erred. This factor is not applicable to the vehicular assault convictions because serious bodily injury is an element of that offense. See e.g., State v. Williamson, 919 S.W.2d 69, 82 (Tenn. Crim. App. 1995). For like reasons, the factor is not applicable to the vehicular homicide based upon the fatal injuries suffered by Ms. Prince. On the other hand, Ms. Prince and her mother, the beneficial and legal owners of the Probe, respectively, suffered property damage in the amount of $6,000, the total value of the vehicle. In this limited sense, factor (6) applies to all offenses. See State v. Danny Lee Ross, Jr., No. 01C01-94-PB-00365, slip op. at 6-7 (Tenn. Crim. App., Nashville, Nov. 21, 1995) (finding that individuals who suffered property damage in a multiple-car wreck were "victims" allowing application of enhancement factor (3) to defendant's vehicular homicide

**22**

convictions involving other victims of same wreck), <u>perm</u>. <u>app</u>. <u>denied</u> (Tenn. 1996) (concurring results only).

The defendant concedes he has a previous unwillingness to comply with the conditions of a sentence involving release into the community. <u>See</u> Tenn. Code Ann. § 40-35-114(8) (1997). This factor is entitled to some weight.[9]

The defendant also concedes he had no hesitation about committing his crimes when the risk to human life was high. <u>See</u> Tenn. Code Ann. § 40-35-114(10) (1997). This factor applies to all cases, we believe, based upon the risk posed to Mr. Perry, whom the defendant recklessly passed in a no-passing zone.

The state invites us to enhance the defendant's sentence based upon

---

[9]The defendant was on probation (from a 1995 Sequatchie County DUI conviction) at the time he committed the present offenses. However, that circumstance in and of itself is not a basis for applying factor (8). <u>See</u> <u>State v. Hayes</u>, 899 S.W.2d 175, 186 (Tenn. Crim. App. 1995) ("commission of the offense for which a defendant is being sentenced should not make factor (8) applicable"). We find that the defendant's 1983 Davidson County offenses of malicious mischief and marijuana possession committed while on a 1983 pre-trial diversion from Rutherford County invokes the use of factor (8), but it is entitled to little weight based on remoteness in time. Of equal or greater significance are the defendant's various incidents of driving on a revoked license earlier in the day on April 7, 1995, prior to the trip which resulted in the fatal collision now before us. These earlier driving offenses were committed while the defendant was on probation. <u>See</u> <u>State v. Randal A. Thies</u>, No. 02C01-9708-CC-00299, slip op. at 8 (Tenn. Crim. App., Jackson, Apr. 24, 1998).

the potential for bodily injury to Mr. Perry. See Tenn. Code Ann. § 40-35-114(16) (1997). This factor is inapplicable to the crime of vehicular homicide based upon this court's holding in State v. Bingham, 910 S.W.2d 448 (Tenn. Crim. App. 1995). Likewise, we decline to apply this factor to the vehicular assault conviction. See State v. Williamson, 919 S.W.2d 69, 82 (Tenn. Crim. App. 1995). As to the driving on a revoked license conviction, the record clearly establishes not only that the defendant drove while his driver's license was revoked, but also that he did it in a way which presented great potential for bodily injury to Mr. Perry. Accord State v. Randal A. Thies, No. 02C01-9708-CC-00299, slip op. at 11-12 (Tenn. Crim. App., Jackson, Apr. 24, 1998). Factor (16) applies to the driving on a revoked license conviction.

Turning to the issue of mitigating factors, the defense offers the defendant's lack of a felony record, his remorse, his continuous employment for 20 years in a position of great trust, and his sole support of his minor child. For the reasons that follow, we decline to apply any of these factors.

We are not compelled to mitigate the defendant's sentence based upon his lack of previous felony convictions. See Tenn. Code Ann. § 40-35-113(13) (1997). Although we have condoned the lack of a prior criminal record as a mitigating factor in appropriate circumstances, see, e.g., State v. Hicks, 868 S.W.2d 729, 731 n.5 (Tenn. Crim. App. 1993), this is not such a case. Mr. Kelly not only has a prior criminal record, it is significant. We find no measure of mitigation in the fact that his prior record consists only of misdemeanor convictions, particularly where he has previously run afoul of the law for drinking and driving, the same conduct which brought about the senseless felonies of which he now stands convicted.

24

We are equally unpersuaded that the defendant should receive mitigation based upon his alleged remorse for his crimes. See Tenn. Code Ann. § 40-35-113(13) (1997). The defendant did not testify at trial or the sentencing hearing, but there was evidence that he had expressed remorse to medical providers. However, there was also evidence that the defendant yelled "I'm sorry" at the victim's mother in an angry tone of voice in the courthouse hall. On balance, we find that the evidence does not establish that the defendant was genuinely remorseful for his crimes. The mitigating factor does not apply.

Finally, we find no measure of mitigation in the defendant's stable employment history in a position of great trust[10] and his support of his minor child. Tenn. Code Ann. § 40-35-113(13) (1997). "Every citizen in this state is expected to have a stable work history if the economy permits the citizen to work, the citizen is not disabled, or the citizen is not independently wealthy." State v. Keel, 882 S.W.2d 410, 423 (Tenn. Crim. App. 1994). Absent any proof that the defendant performed his job well, we have no basis for concluding that he fulfilled his obligation of "great trust." Moreover, we find no proof that the defendant does, in fact, support his children. The presentence report reflects that he has a fifteen year-old-son. Additionally, Lisa Kelly testified at trial that she and the defendant have a two-year-old child. While the defendant reported a child support obligation of $340 per month to the presentence officer, there was no proof that he complied with this obligation.

For the felony conviction of vehicular homicide by intoxication, the defendant, a Range I offender, faced three to six years for this Class C felony.[11]

---

[10]The defendant worked as a railroad locomotive engineer.

[11]As noted in section I above, the potential punishment for the defendant's crime, if committed today, would be much greater than that authorized by the

Tenn. Code Ann. § 39-13-213 (1997); § 40-35-112 (1997).  Considering the weight affored the enhancement factors and the lack of mitigating factors, Mr. Kelly justly deserves a maximum sentence of six years.

The felony conviction of vehicular assault is a Class D felony for which the defendant faced a sentence of two to four years.  Tenn. Code Ann. § 39-13-106(b) (1997); § 40-35-112 (1997).  Again considering the weight appropriate for the enhancement factors and the lack of mitigating factors, a maximum sentence fits the crime.

The misdemeanor driving on a revoked license conviction carried a sentence of up to six months, with a minimum of two days confinement.  See Tenn. Code Ann. § 55-50-504(a)(1) (Supp 1997); § 40-35-111 (1997).  Again, this sentence deserves substantial enhancement, and we find the fact that prior offenses were committed behind the wheel of a motor vehicle particularly relevant to this crime.  A maximum sentence of six months, with maximum release eligibility of 75 percent, is warranted.

**B**

The final consideration is whether the defendant should receive consecutive sentences for his crimes.  In general, consecutive sentencing may be imposed in the discretion of the trial court upon a determination that one or more of the following criteria exist:

(1)     The defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood;

(2)     The defendant is an offender whose record of criminal activity is extensive;

legislature in April 1995.

26

(3)     The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4)     The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5)     The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6)     The defendant is sentenced for an offense committed while on probation; or

(7)     The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b) (1997).  In State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995), the supreme court imposed two additional requirements for consecutive sentencing -- the court must find consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct.  At this time, it is unsettled whether Wilkerson applies to all seven of the statutory categories for consecutive sentencing or only the "dangerous offender" category.  See State v. David Keith Lane, No. 03C01-9607-CC-00259, slip op. at 11 (Tenn. Crim. App., Knoxville, June 18, 1997), perm. app. granted (Tenn. 1998).

This defendant's conduct fits hand-in-glove with the statutory criteria of "behavior indicat[ing] little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high."  Tenn. Code Ann. § 40-35-115(b)(4) (1997).  Mr. Kelly has a history of driving under the influence.  He was on probation for this very crime when he chose, once again, to disregard the law by

**27**

operating a motor vehicle while his blood alcohol concentration was well over the legal limit and without a valid driver's license. This time, his callous indifference for the well-being of others and the bounds of the law had tragic results. Accord State v. Penelope R. Karnes, No. 01C01-9606-CR-00249, slip op. at 8-9 (Tenn. Crim. App., Nashville, May 21, 1997) (two previous DUI convictions and a previous driving on revoked license conviction); State v. Anthony Raymond Bell, No. 03C01-9503-CR-00070, slip op. at 7-8 (Tenn. Crim. App., Knoxville, Mar. 11, 1996) (second DUI offense committed while on probation from earlier DUI conviction), perm. app. denied (Tenn. 1996); Wilkerson, 905 S.W.2d 933 (DUI offense only two months after previous DUI offense).

The defendant is also eligible for consecutive sentencing based on his probationary status at the time he committed these crimes. Tenn. Code Ann. § 40-35-115(b)(6) (1997). He concedes as much in his brief.

Moreover, with respect to the Wilkerson factors, the defendant easily clears this final hurdle for consecutive sentencing. The aggregate sentence of ten years and six months which will result from imposition of consecutive sentencing on each count reasonably relates to the severity of the offense, is necessary to protect the public from further criminal activity by the defendant, and is consistent with the principles of the Sentencing Act. Wilkerson, 905 S.W.2d 933. A more lengthy sentence is appropriate for this defendant who has repeated the same unlawful conduct on multiple occasions and who took the life of a young woman and seriously injured another individual on his most recent repetition. We find strong indications in the record that the defendant has a problem with alcohol, and his behavior indicates he is unwilling or unable to control his drinking, or at least to control his conduct when he is drinking. The public needs to be protected from further criminal activity that may result from the defendant's abuse of alcohol.

Accord Anthony Raymond Bell, slip op. at 8. His status as a repeat offender is illustrative of the fact that lesser terms of punishment have not served to curtail his conduct. Consecutive sentencing is consistent with the principles of the Sentencing Act. The defendant has been given the benefit of less lengthy and less restrictive terms of punishment in the past, yet he has failed to live within the bounds of the law. See Tenn. Code Ann. § 40-35-103(5) (1997) ("The potential or lack of potential for rehabilitation or treatment of defendant should be considered in determining the sentence alternative or length of a term to be imposed.").

In summary, we modify the defendant's conviction related to the homicide of Ginny Prince from second-degree murder to vehicular homicide by intoxication. We reverse and dismiss the DUI and reckless driving convictions. We affirm the defendant's vehicular assault and driving on revoked license convictions. We modify the defendant's effective sentence to ten years and six months, based upon a six-year sentence for vehicular homicide, a four year sentence for vehicular assault, and six months for driving on a revoked license, each to be served consecutively.

_____
CURWOOD WITT, JUDGE

CONCUR:


_____
GARY R. WADE, JUDGE


_____
WILLIAM M. BARKER, JUDGE

**29**