# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 18, 2010 Session

## STATE OF TENNESSEE v. RONNIE WAYNE BLAIR

**Direct Appeal from the Circuit Court for Wilson County**
**No. 07-0345       John D. Wootten, Jr., Judge**

---

**No. M2009-01987-CCA-R3-CD - Filed March 3, 2011**

---

A Williamson County jury convicted the Defendant, Ronnie Wayne Blair, of Driving Under the Influence ("DUI"), first offense. The trial court sentenced him to eleven months and twenty-nine days, all of which was suspended after the service of four days. On appeal, the Defendant contends that the trial court improperly limited his cross-examination of the arresting officer by preventing use of the National Highway Traffic Safety Administration ("NHTSA") manual and that the trial court improperly commented on the evidence. The State counters that this appeal should be dismissed because the Defendant failed to timely file his notice of appeal. After a thorough review of the record and applicable law, we conclude that the interests of justice require waiver of the Defendant's untimely filing of his notice of appeal. However, upon our consideration of the merits of the Defendant's issues, we conclude the Defendant is not entitled to relief. The judgment of the trial court is, therefore, affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which DAVID H. WELLES and NORMA MCGEE OGLE, JJ., joined.

G. Frank Lannom, Lebanon, Tennessee, for the Appellant, Ronnie Wayne Blair.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; Tom P. Thompson, District Attorney General; Linda D. Walls, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the Defendant driving his car while under the influence of alcohol during the early morning hours of December 10, 2006. Sergeant Mike Bay stopped the Defendant based upon the Defendant's driving violations and subsequently asked him to perform several field sobriety tests. Based upon his performance, the officer arrested the Defendant for DUI.

## A. Pretrial Motion

In a motion in limine, the Defendant sought to introduce portions of the NHTSA manual, which educates officers on field sobriety tests and clues that a defendant may be intoxicated, for purposes of cross-examination of the arresting officer concerning the officer's compliance with the manual. The NHTSA manual is utilized in training law enforcement officers to administer field sobriety tests. The trial court held a hearing, during which the following evidence was presented:

Officer Mike Bay testified that he arrested the Defendant for DUI after administering five field sobriety tests to the Defendant. The first test was the Horizontal Gaze Nystagmus ("HGN") test, which the State conceded was not admissible.[1] The second test was an "alphabet" test where the officer asked the Defendant to recite part of the alphabet, specifically letters "H" through "U". This, the officer conceded, was not a standardized field sobriety test. The third field sobriety test entailed asking the Defendant to count down from 63 to 47, which is also not a standardized field sobriety test. The fourth and fifth tests were both standardized field sobriety tests, the one-legged stand test and the walk and turn test. The officer testified that when he said "standardized" he meant that they were identified by NHTSA as the highly reliable and valid tests for detecting impairment due to an elevated blood alcohol level. According to the NHTSA manual, the one-legged stand test has a 65% rate of reliability and the walk and turn test has a 68% rate of reliability in indicating impairment.

Officer Bay testified that, while he did not take the NHTSA manual with him while on patrol, he used the NHTSA manual as a guide. He did not give the Defendant verbatim instructions from the manual; rather, he used his own language when instructing the Defendant about successfully completing the tests. During the tests, the officer looked for the "clues" the manual identified as indicators of intoxication.

After arguments by the parties, the trial court concluded that Officer Bay was not

_____

[1] *See State v. Murphy*, 953 S.W.2d 200 (Tenn. 1997) (holding that horizontal gaze nystagmus tests are "scientific" and must, therefore, meet the requirements of Tennessee Rules of Evidence 702 and 703 to be admissible).

being offered as an expert and that, because field sobriety tests are not scientific, the NHTSA manual did not contain information on scientific tests. The trial court further found that because Officer Bay arrested the Defendant based upon his training as well as his life experience, his testimony fell under Tennessee Rule of Evidence 701 regarding lay witnesses.

## B. Trial

The Defendant does not challenge the sufficiency of the convicting evidence against him, and we, therefore, summarize the facts in the light most favorable to the State.

Before trial, the trial court clarified that the Defendant was not allowed to cross-examine the arresting officer using the NHTSA manuals. Officer Mike Bay with the Lebanon Police Department testified that he had been trained as a police officer in detecting individuals who may be driving under the influence. This detection involved three phases: (1) the driver's operation of his vehicle; (2) whether the officer noticed the odor of an intoxicant, slurred speech, glassy eyes, or other common signs of intoxication when he initially stopped the driver; and (3) the results of standardized field sobriety tests. The officer explained that, before having drivers attempt a field sobriety test, he explained the instructions for the test to the driver. Officer Bay went on to explain in detail the field sobriety tests and the indicators of intoxication he looks for in the driver's performance of those tests.

Officer Bay testified that on December 10, 2006, at around 1:30 a.m., he was on patrol when he saw a red Ford pickup truck exceeding the speed limit. The officer began to follow the truck, which reached speeds of sixty miles per hour in a forty mile-per-hour zone. The truck veered outside its lane, and the driver appeared to be having a difficult time staying in one lane. The officer activated his blue lights to initiate a stop of the truck. The driver did not slow down. The officer intermittently activated his siren to get the driver's attention, but the truck still did not slow down. The driver activated his turn signal, entered a gas station, and stopped at the gas pumps. The Defendant immediately exited his truck, and Officer Bay yelled for the Defendant to return to the truck. The Defendant got back into his truck but, shortly thereafter, again exited the truck. The officer again told the Defendant to return to the truck and asked him to place his hands on the steering wheel.

The officer testified he began speaking with the Defendant and asked him why he was speeding. When the Defendant responded, the officer noticed the smell of alcohol and also that the Defendant's eyes were red and glassy. The officer asked the Defendant for his identification and truck registration and then asked him to exit the truck to continue their conversation. Officer Bay asked the Defendant what time it was, and the Defendant responded that it was 11:30 p.m., about two hours earlier than the actual time. The

Defendant told the officer that he was at home in Watertown when he decided to go to Lebanon to get a cold drink, explaining that all the stores in Watertown were closed. At this point, the officer noticed a wrist band on the Defendant that the officer recognized as being the same type that are given to people entering the Silverados nightclub. When he asked the Defendant about this, the Defendant admitted that he had been at the nightclub. The Defendant said he had left his house at around 10:30 p.m. and arrived at Silverados around 11:10 p.m. He said he stayed about half an hour and then left. The Defendant again stated his belief that it was 11:30 p.m.

Officer Bay testified he asked the Defendant to perform several field sobriety tests, one of which was the walk and turn test, which requires the subject to take nine heel-to-toe steps, turn around, and repeat the nine steps. He asked the Defendant to imagine a straight line and to put his left foot on the line, then to put his right foot in front of his left foot on the same line. He then asked the Defendant to stand in that position while he explained the rest of the task. The Defendant had difficulty maintaining that position and had to move his front foot to the side to avoid falling over. The Defendant explained to the officer that he was wearing cowboy boots with a heel that he only wore once or twice a year. The officer said he asked the Defendant if he would prefer to perform the test without his boots, and the Defendant took his boots off to perform the test. Even without the boots, however, the Defendant had difficulty maintaining his balance while standing in the beginning position and could not stand without moving his foot. While performing the task, the Defendant missed three times, failed to touch his toes to his heel, and continually raised his arms to balance himself while performing this test. The Defendant also did not stop after nine steps as instructed, and took ten steps. Further, while counting aloud, the Defendant did not count accurately from one to ten. The Defendant then forgot to make the turn and to continue the nine steps back to the officer. After the officer reminded him to turn around and take nine more steps, the Defendant attempted to return to the officer, but instead stepped on his own toes on five occasions and continued to use his arms to balance himself.

Officer Bay testified that he next asked the Defendant to perform the one-leg stand field sobriety test. The officer asked the Defendant to raise one leg and stand that way, keeping his hands at his sides, and count up from 1001 until the officer told him to stop. The Defendant began the test and started counting from one up. The officer reminded the Defendant to start counting at 1001, and the Defendant began to count correctly. Upon reaching 1013, the Defendant asked much how longer he had to count, and the officer told him to continue until he said to stop. The Defendant was unable to follow this command.

The officer testified he next asked the Defendant to recite part of the alphabet starting with the letter "H" and stopping at "U." The Defendant, who indicated he knew his alphabet, began correctly but then incorrectly recited the letters in the order of "Q", "I", "P." The

Defendant was unable to complete this task and asked the officer if he could start at the letter "A". Officer Bay agreed, but the Defendant still did not recite the letters of the alphabet in the correct order.

In the final test, the officer first asked the Defendant if he could count to 100. The Defendant indicated he could, and the officer asked him to count backward from 63 to 47. The Defendant was unable to complete this task.

Based upon the Defendant's driving, his statements, and his performance during the field sobriety tests, the officer concluded that the Defendant's blood-alcohol level was above the legal limit and that the Defendant should not be operating a motor vehicle. The officer arrested the Defendant. The officer then asked the Defendant to submit to a blood test and informed him that his refusal would result in a violation of the Implied Consent Law and suspension of his driver's license. The Defendant said he was scared of needles and did not want to take the test and then signed the implied consent sheet.

The officer then introduced a video captured by the camera located in his patrol car. He manually activated the camera when he first saw the Defendant's pickup truck weave over the white line, and the camera remained activated through the duration of the field sobriety tests. That video was played for the jury.

On cross-examination, Officer Bay testified that he was located between one and a half and two miles from I-40 when he first saw the Defendant and that he saw the Defendant's car weave only once before he activated the video camera in his patrol car. Officer Bay agreed that the Defendant signaled appropriately before entering the gas station, but he believed the Defendant at this point had not noticed he was trying to stop the Defendant. Because the Defendant pulled up to the gas pump and got out of his car without looking at the officer, the officer believed the Defendant was not aware of the officer's presence. The officer described the Defendant as "cooperative" during their interaction. The officer testified he found a cooler in the Defendant's truck that contained between ten and fifteen beers, many of which were unopened. The officer thought, however, that the Defendant could not reach the cooler from the driver's seat.

On redirect examination, Officer Blair testified that he asked the Defendant to submit to a blood test. This was based, in part, on the Defendant's admission to him that he had ingested a Xanax that was not prescribed to him. The officer said that, because a breathalyzer test does not detect drugs, he asked the Defendant to submit to a blood test.

The Defendant testified he was, at the time of trial, forty-eight years old and had lived in Wilson County the majority of his life. He achieved the tenth grade before dropping out

of high school, where he had been assigned to special education classes. The Defendant maintained employment in construction, starting first as a carpenter and then eventually becoming a superintendent. The Defendant said he owned the house in which he and his daughter both lived.

Discussing the night he was arrested for his conduct in this case, the Defendant said he was, at that time, working for Meadow Homes , installing modular homes across the state, which required him to work from 4:00 a.m. until 7:00 p.m. On the morning before his arrest, he worked around his house, doing laundry and resting. He took a sleeping pill and slept from 5:00 p.m. until 10:00 p.m. when his phone awoke him. A friend, Ricky Forkum, whom he had not seen in four or five years called him and asked him to meet at Silverados to talk. The Defendant agreed and drove his 1992 model Ford F-150, to which he had added large rims and tires. He said these large rims and tires caused "play" in his steering wheel which sometimes resulted in his weaving. The Defendant said he had since replaced the large tires with standard tires to avoid this problem.

The Defendant said he met his friend at Silverados at around 11:00 p.m., and he had one beer while there. The Defendant acknowledged that though he initially thought that he had only been at Silverados for thirty minutes, he may have been there longer. He explained that his initial impression of the time he spent at Silverados led him to give the officer an incorrect time.

The Defendant said he saw the officer's blue lights immediately but did not pull off the road until later because he thought the gas station would be a good place to pull over. He testified he pulled into the gas pump because he again thought this would be the best place for him to stop. The Defendant said that when the officer first yelled to him, he only heard the word "truck," so he got out of his truck. When the officer yelled to him again, he immediately returned to his truck. The Defendant said he sat in his truck for a few minutes, thinking. When there was no further communication with the officer, the Defendant thought perhaps the officer had meant to tell him to get out of the truck, so he again exited his truck. The officer immediately told him to return to his truck, and the Defendant complied. The Defendant said he complied with each of the officer's subsequent requests.

The Defendant said the evening was cold, estimating it was twenty-six degrees at the time of his field sobriety tests. He said he was wearing cowboy boots with a heel, which prevented him from being able to stand with one foot in front of the other while the officer gave instructions. Despite this, however, he only moved his foot from the position instructed one time. Because he could not successfully complete the task, he took his boots off and attempted it again. He said that when he tried this task in his stocking feet, the heel of one of his feet stepped on the front of his sock. Therefore, he no longer touched his heel to his

toe, which the officer said was a "miss."

The Defendant said that, when the officer next asked him to stand on one foot, though he "did his best," standing on one foot was difficult because his foot was frozen and he was nervous. The Defendant further testified that he had difficulty counting backwards, explaining that he attended remedial math classes in high school. The Defendant said he also attended speech class as a child because he sometimes did not say aloud the things he was thinking, which is what happened during his recitation of the alphabet. The Defendant agreed he had beer in a cooler in his truck at the time of his arrest but said he had not had a beer to drink from that cooler in two or three days. The Defendant maintained his driving was not impaired on the evening in question.

On cross-examination, the Defendant agreed that, before he turned into the Pilot gas station on his left, he passed another gas station on his right. The Defendant said he refused the blood-alcohol test because he did not like needles, and he did not recall the officer telling him his refusal would result in his license being suspended for a period of one year. After being shown a portion of the videotape of his arrest, the Defendant admitted that, around the time of his arrest, he drank two or three beers nightly in order to sleep better. He testified he no longer consumed that quantity of alcohol.

On redirect examination, the Defendant testified doctors had recommended he have a cortisone shot to alleviate pain he had in his shoulder. He testified that he declined this treatment.

The Defendant offered two character witnesses, each of whom testified the Defendant had a reputation for truthfulness and honesty and was dependable.

Based upon this evidence, the jury convicted the Defendant of DUI, first offense. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the trial court erred when it: (1) limited his use of the NHTSA training manual during cross-examination of the arresting officer; and (2) commented on the evidence by giving the jury a repetitive instruction. The State counters that this appeal should be dismissed because the Defendant failed to timely file his notice of appeal. We will discuss the State's waiver argument first.

### A. Waiver

The State contends that the Defendant has waived our review of this case by failing to timely file his notice of appeal. The Defendant filed a motion for new trial on January 12, 2009, and an amended motion for new trial on July 31, 2009. The trial court entered an order denying the motion for new trial on August 14, 2009. That order states, "This cause came to be heard on the 14th day of August, 2009, . . . upon the Defendant's original and amended motion for a new trial, upon the record and upon arguments of counsel, the Court finds that the Motion should and is hereby DENIED." A second order denying the motion for new trial was entered on September 22, 2009. That motion states:

> This case came to be heard on the 3rd day of August, 2009, . . . upon the Motion for a New Trial filed by the Defendant . . . . Based upon the arguments of Counsel and the entire record as a whole, the Court finds as follows that the motion of the Defendant was not well taken and it is hereby **ORDERED, ADJUDGED AND DECREED** that the Defendant's Motion for a New Trial is hereby DENIED."

The Defendant's notice of appeal was entered on September 22, 2009.

In *State v. Hatcher*, 310 S.W.3d 788 (Tenn. 2010), the Tennessee Supreme Court advised:

> [T]rial courts should not hold any hearing on a motion for new trial until a reasonable time after the sentencing has been held, sentence has been imposed, and the judgment order entered. If the defense files a timely motion for new trial, the trial court should provide the defense with ample opportunity to amend the motion prior to holding the new trial hearing. If new counsel is sought and obtained, additional time for amendments to the motion for new trial may be granted as necessary. *Once the hearing on the motion for new trial is heard and an order denying a new trial has been entered, however, motions to make additional amendments must be denied.*

*Id.* at 804 (emphasis added). In *State v. Arturo Jaimes-Garcia*, this Court recently discussed the effect of trial proceedings taking place after the denial of a motion for new trial: "All proceedings in the trial court following the trial court's [order] denying the [d]efendant's motion for new trial . . . would be of no legal effect." No. M2009-00891-CCA-R3-CD, 2010 WL 5343286, at *9 (Tenn. Crim. App., at Nashville, December 22, 2010). Applying *Jaimes-Garcia* to this case, the trial court's second order denying the Defendant's motion for new trial entered on September 22, 2009, was of no legal effect. Therefore, the Defendant had thirty days after the trial court entered the first order denying his motion for new trial on August 14, 2009, to file his notice of appeal. Tenn. R. App. P. 4(c). The Defendant,

however, did not file his notice of appeal until September 22, 2009. The Defendant's notice of appeal was, therefore, untimely.

"In all criminal cases, the notice of appeal document is not jurisdictional and the filing of such document may be waived in the interest of justice." Tenn. R. App. P. 4(a). While we strongly encourage parties and courts to follow these rules of procedure, which were enacted by the rules commission for specific and sound reasons, we conclude the interest of justice is served by waiver of the untimely filing of the Defendant's notice of appeal. Accordingly, we turn to address the Defendant's remaining issues.

## B. NHTSA Manual

The Defendant contends that the trial court improperly prevented him from using the NHTSA manual to cross-examine Sergeant Bay, a lay witness, about the field sobriety tests he conducted with the Defendant. The Defendant argues that, because the officer testified the manual was used in his training to teach how to give these field sobriety tests and also how to glean "clues" from field sobriety tests about whether a driver is impaired, his Sixth Amendment confrontation rights entitled him to question the officer about the manual. The State counters that, because field sobriety tests are not scientific tests requiring the testimony of a qualified expert, Officer Bay was testifying as a lay witness. Further, lay witnesses may not be impeached using learned treatises, and the NHTSA manual, even if a learned treatise, could only be used to impeach an expert.

At the conclusion of the trial, in a jury-out hearing, Sergeant Bay testified that he uses information from the NHTSA manuals to determine whether a driver is impaired. Further, he testified that he determines the number of "clues" that indicate intoxication based upon an outline of clues in the manual. He said that, while these clues help him, they are not the only factor in determining driver impairment. The officer testified that the manual assigns each test a "percentage of accuracy," which indicates the likelihood that a driver who failed the test is actually impaired. He said that the walk and turn test has a 68% accuracy rate and the one leg stand test has a 65% accuracy rate.

The trial court found:

[T]he field sobriety tests are not scientifically accurate, . . . [and] this officer has not been qualified as an expert. And in as much as he has . . . not been qualified as an expert, no such cross-examination can be made by the use of a learned [treatise]. And these manuals haven't been established as such anyway.

The Defendant couches his argument in terms of the Confrontation Clause. The Confrontation Clause of the Sixth Amendment commands: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. This fundamental right of confrontation applies to the states through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403 (1965); *see State v. Henderson*, 554 S.W.2d 117, 119 (Tenn. 1977). The Tennessee Constitution also guarantees the right of confrontation, providing "[t]hat in all criminal prosecutions, the accused hath the right to . . . meet the witnesses face to face . . . ." Tenn. Const. art. I, § 9. Although the provisions are not entirely coextensive, our Supreme Court has concluded that "there is no reason to interpret" the state and federal guarantees differently when considering Confrontation Clause claims. *State v. Lewis*, 235 S.W.3d 136, 141-42 (Tenn. 2007).

The Confrontation Clause affords "two types of protection for criminal defendants: the right to physically face the witnesses who testify against the defendant, and the right to cross-examine witnesses." *Id*. at 142 (quoting *State v. Williams*, 913 S.W.2d 462, 465 (Tenn. 1996)). The right to confrontation is not, however, a right to limitless cross-examination. *See id*.; *see also Delaware v. Van Arsdall*, 475 U.S. at 673, 679 (1986) (noting that confrontation does not guarantee a right to "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish"). "[A] defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confrontation, witness safety, or merely repetitive or marginally relevant interrogation." *State v. Wyrick*, 62 S.W.3d 751, 770 (Tenn. Crim. App. 2001) (citing *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994)). Instead, the exercise of the right to confrontation "is controlled by the trial judge," and "the trial court's decision will be upheld absent an abuse of discretion." *State v. Rice*, 184 S.W.3d at 646, 670 (Tenn. 2006) (quotation marks omitted) (discussing the right to cross-examine a witness on the basis of bias). This Court will not disturb the limits that a trial court has placed upon cross-examination unless the court has unreasonably restricted the right. *Dishman*, 915 S.W.2d at 463; *State v. Fowler*, 373 S.W.2d 460, 466 (Tenn. 1963).

Rule 618 of the Tennessee Rules of Evidence allows a party to impeach an expert witness with a learned treatise.[2] This rule allows a party to impeach the expert witness using

---

[2]That Rule states:

> To the extent called to the attention of an expert witness upon cross-examination or relied upon by the witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness, by other expert testimony, or by judicial notice, may be used to impeach the expert witness's

(continued...)

-10-

a learned treatise to test the expert's knowledge and understanding of a topic at issue. Neil P. Cohen et al., *Tennessee Law of Evidence*, § 6.18 [2][a] (5th ed. 2005). When the requirements of Rule 618 are satisfied, the most common approach for using this impeachment technique is for counsel to read a portion of a treatise, ask the expert witness whether he or she agrees with the treatise, and compare the treatise with the expert's response. *Id*. at § 6.18 [2][b]. A learned treatise may not be used to impeach a lay witness, since Rule 618 extends only to impeachment of expert witnesses. *Id.* at § 6.18[2][a].

"A defendant may be convicted of DUI based on either evidence of intoxication or evidence showing that the defendant had a blood-alcohol concentration of .10% or more." *State v. Everett D. Robinson*, No. W1999-01348-CCA-RE-CD, 2000 WL 364844, at *4 (Tenn. Crim. App., at Jackson, Apr.7, 2000) (citing T.C.A. § 55-10-401(a)), *no. Tenn. R. App. P. 11 application filed*. Evidence of intoxication includes the observations of a police officer during a defendant's performance of field sobriety tests. With the exception of the HGN test, field sobriety tests are not scientific tests requiring testimony of a qualified expert pursuant to Tennessee Rule of Evidence 702. *See State v. Murphy*, 953 S.W.2d 200, 202-03 (Tenn. 1997): *State v. Gilbert*, 751 S.W.2d 454, 459 (Tenn. Crim. App. 1988). Thus, police officers generally do not need to be qualified as expert witnesses in order to testify about their administration and interpretation of field sobriety tests. *Robinson*, 2000 WL 364844, at *3 (citing *State v. Christopher R. Hicks*, No. 03C01-9602-CC-00064, 1997 WL 260069, at *1 n.1 (Tenn. Crim. App., Knoxville, May 13, 1997), *no Tenn. R. App. P. 11 application filed*).

In the case under submission, the police officer was not offered or recognized as an expert; rather, he testified as a lay witness. In *Hicks*, a case cited by the State, this Court addressed whether prohibiting defense counsel from impeaching an officer's testimony about a DUI arrest through the use of a manual upon which he had been trained was error. 1997 WL 260069, at 1. The manual included information on the administration and interpretation of certain field sobriety tests, including the HGN test, the "walk and turn" test, and the "one leg stand" test. *Id*. This Court held:

> As correctly noted by the State, [the testifying officer] was not tendered as an expert witness. And, as correctly noted by the trial court, "the only time you can use a book like that to impeach a witness is if the witness is an expert witness and you can show [him] other expert books to impeach him to show

---

[2](...continued)
credibility but may not be received as substantive evidence.

Tenn. R. Evid. 618.

that he might be wrong." *See* Tenn. R. Evid. 618. The trial court committed no error by refusing to allow defense counsel to impeach [the officer] by reading into the record from the training manual and cross-examining him about his memory thereof and/or his application of the information with which he had been trained.

*Id*.

While we are not bound by the conclusions of this Court in the aforementioned unpublished opinion, we find its reasoning sound. Defense counsel may only use a manual to formulate questions for cross-examination; counsel may not use it to impeach the officer. To subject a "lay" witness, whose testimony by definition is based only upon facts observed, not about opinions or inferences, to cross-examination based upon a "learned treatise" in the same fashion an expert is subjected to cross-examination would be improper. *See* Cohen, et al., Tennessee Law of Evidence, § 7.01[4][a] . The Defendant is, therefore, not entitled to relief on this issue.

### C. Comment on Evidence

The Defendant next asserts that the trial judge improperly commented on the evidence by repeatedly reminding the jury that it was the officer's choice for purposes of the Implied Consent Law whether to ask the Defendant to submit to a Breathalyzer test or a blood test to determine whether his blood alcohol level exceeded legal levels. The State counters that whether the Defendant violated the implied consent law was not an issue before the jury and, therefore, the Defendant's questioning of the officer about this was irrelevant and misleading. Further, the State asserts that, while the trial court afforded the Defendant the latitude to question the officer in this regard, the trial court's articulation to the jury of an accurate statement of law did not amount to commenting on the evidence.

The Defendant was not being tried by the jury for a violation of the implied consent law, and the only charge to be decided by the jury was whether the Defendant was guilty of DUI, first offense. During the trial, the officer testified he asked the Defendant to submit to a blood test and informed him that his refusal to do so would result in a violation of the Implied Consent Law and suspension of the Defendant's driver's license. The officer recalled that the Defendant, saying he was scared of needles, did not want to take the test and signed the implied consent sheet. During cross-examination, defense counsel asked the officer whether a method of determining a person's blood-alcohol level other than a blood test existed. The State objected to relevancy. The trial court allowed defense counsel to question the officer in this regard but said it was going to give the jury an instruction. The Defendant's counsel proceeded without further objection. The officer said that a

breathalyzer test would detect a person's blood-alcohol level but would not detect the presence of other drugs in the person's system. Because the Defendant had admitted to taking Xanax earlier in the evening, the officer asked the Defendant to submit to a blood test. At this point, the trial court informed the jury that the choice of whether to provide a breathalyzer test or blood test is the officer's and not the Defendant's choice. The Defendant objected to this instruction. At another point during cross-examination, the Defendant asked the officer whether a breathalyzer machine was present and available, and the trial court offered the same instruction.

During the Defendant's testimony in his own defense, the Defendant said that he refused the blood-alcohol test because he did not like needles and that he did not recall the officer telling him his refusal would result in a one year suspension of his license. The Defendant's counsel asked the Defendant whether the officer offered him a test that did not involve needles, and the Defendant said, "No." At this point, the trial court again reminded the jury that whether to use a breathalyzer rather than a blood test was the officer's and not the Defendant's choice.

Judges in Tennessee are prohibited by our state constitution from commenting upon the evidence during trial. Tenn. Const. art. VI, § 9. In all cases the trial judge must be very careful not to give the jury any impression about his or her feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." *State v. Suttles*, 767 S.W.2d 403, 406-07 (Tenn. 1989). In other words, a trial judge should be very careful not to give the jury the impression of favoring either the defendant or the State. *State v. Harris*, 839 S.W.2d 54, 66 (Tenn. 1992).

We conclude first that the trial court's comments were an accurate statement of the law. *See State v. Turner*, 913 S.W.2d 158, 161 (Tenn. 1995) (holding that "a statute which provides that a test is to be administered at the direction of a law enforcement officer clearly intends that the officer with knowledge about the available equipment and facilities shall select the testing method"). The Defendant's objection is based upon the trial court offering its instruction on more than one occasion. We conclude that the trial court's actions were necessary and in response to the Defendant's repeated questioning about the option for a test other than a blood test. The trial court's actions were in no way improper, and the Defendant is not entitled to relief.

### III. Conclusion

After a thorough review of the record and the applicable authorities, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE