STATE of Tennessee, Appellee,

v.

Sam Austin TURNER, Appellant.

Supreme Court of Tennessee,
at Nashville.

Dec. 28, 1995.

Donald G. Dickerson, Cookeville, for Appellant.

Charles W. Burson, Attorney General and Reporter, Eugene J. Honea, Associate Solicitor General, Nashville, William E. Gibson, District Attorney General, Owen G. Burnett, Assistant District Attorney General, Cookeville, for Appellee.

## OPINION

WHITE, Justice.

■ Following an acquittal on the charges of driving under the influence of an intoxicant, the trial court determined that Sam Austin Turner had refused to submit to a chemical test to determine the alcoholic content of his blood and, consequently, suspended Turner's operator's license for six months pursuant to Tennessee Code Annotated Section 55–10–406, the implied consent law. Turner contends that under the statute the accused has the right to choose the type of chemical test and that his offer to take a blood test satisfies the implied consent law despite his refusal to take a breath test. Thus, we are called upon to determine whether an accused complies with the implied consent law when the accused offers to take a specific chemical test to determine the alcoholic content of the blood, but specifically refuses to take the test offered by the officer.

## FACTS

Sam Austin Turner was stopped in Putnam County for "bad driving." After a series of field sobriety tests, Officer Randall Brown arrested Turner and took him to the police station. There, Officer Brown requested that Sergeant David Dukes give Turner a test using the intoximeter to determine the alcoholic content of his blood. The standard implied consent form was read to Turner who signed the form indicating his refusal to submit to the test. Turner offered, however, to take a blood test.[1]

Turner was indicted for driving under the influence of an intoxicant and for violating the implied consent law. A jury acquitted Turner of driving under the influence. The trial judge, upon the state's motion, found that Turner had refused to submit to the test

and suspended his operator's license for six months.

Turner appealed to the Tennessee Court of Criminal Appeals, which, upon the state's motion, transferred the case to the Tennessee Court of Appeals.[2] In that court, Turner challenged the trial court's finding on two bases:

1) that the testing officer did not have reasonable grounds to believe that Turner was driving under the influence; and

2) that because Turner agreed to take *a* chemical test, albeit not the one offered by the officer, he did not violate the statute.

Rejecting both arguments, the Court of Appeals affirmed the suspension of Turner's operator's license. In this Court, Turner has limited his issue to one. We are called upon to squarely address this succinct issue: does the officer or the motorist select the testing method?

■ Like the laws in most states, our legislation aimed at curbing the serious problem of driving under the influence of an intoxicant contains a provision, commonly referred to as the implied consent law, which presumes that all motorists who have accepted the privilege of operating a motor vehicle in our state have impliedly consented upon request to take a chemical test to determine the alcoholic or drug content of the blood. Our statute provides:

Any person who drives any motor vehicle in the state is deemed to have given consent to a test for the purpose of determining the alcoholic or drug content of that person's blood; provided that, such test is administered at the direction of a law enforcement officer having reasonable grounds to believe such person was driving

1. Some dispute exists as to when Turner made this offer. Our decision does not in any way depend on whether Turner's version, that he offered immediately, or the officer's version, that it was forty-five minutes later, is correct.

2. Initially, the state argued that Turner's appeal should be dismissed because of a failure to exhaust administrative remedies through the Tennessee Department of Safety administrative hearing provisions. The Court of Appeals denied that

motion based on the statute's 1987 amendment that substituted the trial court for the Department of Safety as the institution responsible for determining whether the implied consent law was violated. Tenn.Code Ann. § 55–10–406(a)(2) (1995 Supp.). The state raised the argument again on appeal, and, it was again rejected. The state did not request Rule 11 review, and therefore, the issue is not before this Court.

while under the influence of an intoxicant or drug. . . .

Tenn.Code Ann. § 55–10–406(a)(1)(1995 Supp.). Thus, one arrested for driving under the influence who refuses to submit to a test, after being advised that refusal will result in a suspension of the operator's license, is charged with violation of the implied consent law. *Id.* at (a)(2) & (3). Upon a finding that the driver violated the provision, the court is required to suspend the driver's operator's license for six months. *Id.* at (a)(3).

■ Our statute also defines "test" as used in the implied consent law. "Test" means "any chemical test designed to determine the alcoholic or drug content of the blood. The specimen to be used for such test shall include blood, urine or breath. . . ." Tenn.Code Ann. § 55–10–405(5) (1993 Repl.). Combining this definition, which includes blood tests, with the implied consent statute's requirement that a driver submit to "a test," Turner argues that his offer to take a blood test was compliance with the statute despite his refusal to take the specific test requested by the officer. If Turner's proposition is accepted, the result would be that drivers have the choice as to which type of test to take under our implied consent law. While there is no question that an accused has the right to an additional *sample* for a *separate* test, Tenn.Code Ann. § 55–10–410(e) (1995 Supp.), that is not Turner's contention. Rather, he contends that the driver has the right to choose *the* test upon which the state will then rely for its evidence at trial. The Court of Appeals rejected this argument relying on authority from other states interpreting similar statutes to vest the choice of test in the officer.

■ The language of our statute lends itself to both Turner's and the appellate court's interpretation. Read literally and exclusively, section 406(a)(1) supports Turner's interpretation. It provides that drivers have consented to "a test." Thus, given the broad definition of "test" in section 405(5), Turner's consent to a blood test would, arguably, constitute compliance. But we are not at liberty to read the statute in isolation as Turner does. In interpreting statutes, we are required to construe them as a whole, read

them in conjunction with their surrounding parts, and view them consistently with the legislative purpose. *See e.g., City of Lenoir City v. State ex rel. City of Loudon,* 571 S.W.2d 297 (Tenn.1978); *Tidwell v. Servomation–Willoughby Co.,* 483 S.W.2d 98 (Tenn. 1972); *Western Pipe Line Constructors, Inc. v. Dickinson,* 203 Tenn. 248, 310 S.W.2d 455 (1958). The construction must not be strained and must not render portions of the statute inoperative or void. *Tidwell v. Collins,* 522 S.W.2d 674 (Tenn.1975). We must seek a reasonable construction in light of the purposes, objectives, and spirit of the statute based on good sound reasoning. *Dorrier v. Dark,* 537 S.W.2d 888 (Tenn.1976). When we employ those required rules of construction, the logic in Turner's interpretation disappears.

■ The purpose of our driving under the influence statutes is to remove from the highway, prosecute, and punish those who engage in the dangerous menace of driving under the influence. The legislature intended to enable the state to establish the offense by scientific evidence. For the privilege of operating a vehicle on our highways, the driver consents to a test to determine whether that privilege is, as a law enforcement officer suspects, being abused. Subsections 2 and 3 of the statute unequivocally give the officer the prerogative of requesting submission to a test selected by the officer. *Id.* at § –406(a)(2) & (3). Subsection 1 requires that the test must be "administered at the direction" of the officer. *Id.* at § –406(a)(1). Furthermore, if the driver had the option of choosing the test, section 410's additional sample provision would be rendered meaningless. When the statute is read as a whole and construed in light of the legislative purposes of punishing drivers who operate vehicles while under the influence *and* penalizing drivers who refuse to honor their implied consent to testing, the reasonable conclusion is that the officer, not the driver, must select the test.

We need not rest our conclusion solely on statutory interpretation, however. We are also guided by the decision of a number of states who, unlike us, have faced this issue before. Our research has uncovered the rule in thirty-six states, twenty-five of which allow

the officer to select the test. While reviewing the actions of other state courts is helpful, we do so with an acute awareness of the different statutes which the courts were called upon to interpret. Some statutes provide that drivers may choose between alternate tests. Others require or encourage the officer to inform the driver of alternative tests which can be taken in addition to the test selected by the officer like ours, do not directly address the choice issue and must be interpreted.

The majority of states with statutes akin to ours have concluded as we have that the officer selects the test. But more important to us than being in the "majority," is that the reasoning of those majority decisions is far more persuasive than that in the decisions allowing the driver to select the method of testing.

Courts allowing the officer to select the test have reasoned that the officer, rather than the driver, has the information regarding the available tests. *Kiso v. King*, 691 S.W.2d 374, 377 (Mo.App.1985). Since the driver is not aware necessarily of which tests are available, the choice could be an illusory one, if, in fact, all possible methods were not available, or a calculated one, if the driver chose a test known to be either unavailable or available at such a distance as to nullify the results. *See State v. Sensing*, 843 S.W.2d 412 (Tenn.1992). Which tests were available might depend on the departmental, or even worse, the driver's, resources. Since differentiation could not depend on the driver's financial ability, the department (or state) might opt to limit the testing methods to those equally available to all. Otherwise, determinations of indigency or issues of the right to a state-financed test might arise.

Other practical concerns would arise. Presumably, a time period for choosing a test would have to be established to assure that a driver did not obviate the test requirements by his or her indecision. Qualified or equivocal consents would present difficulties for the officer and the trial court. *See Westmoreland v. Chapman*, 268 Cal.App.2d 1, 74 Cal. Rptr. 363 (1968) (driver consented to test only if driver's doctor performed test). Consent to tests which required transporting the driver to another location would place demands on police department resources.

Even those states that allow the driver to choose the test have established safeguards to avoid these likely pitfalls. Virginia, for example, allows a choice by the driver "only if both (blood and breath tests) are available." *Driver v. Commonwealth of Virginia*, 6 Va.App. 583, 371 S.E.2d 27, 28 (1988) (interpreting Va.Code Ann. § 18.2–268(B)). The statutes of Maryland, Connecticut, Nebraska, and Oklahoma allow the driver to choose, but limits the types of tests from which the choice is available. *Sites v. Maryland*, 300 Md. 702, 481 A.2d 192 (1984) (interpreting Md.Code Ann.Transp. § 16–205.1); *State v. Hanusiak*, 225 A.2d 208 (Conn.App. 1966) (interpreting Conn.Gen.Stat. § 14–22–27b); *Prucha v. Department of Motor Vehicles*, 172 Neb. 415, 110 N.W.2d 75 (1961) (interpreting Neb.Code Ann. § 39–727.03); *Bailey v. City of Tulsa*, 491 P.2d 316 (Okla. Crim.App.1971) (interpreting 47 O.S.Supp. 1970, §§ 751–60). Minnesota designates that a blood test be given, but allows the driver to opt for a breath or urine test instead. *State Dep't of Highways v. McWhite*, 286 Minn. 468, 176 N.W.2d 285 (1970) (interpreting Minn.St.1967 § 169.123 sub. 4).

As we have noted, the majority rule in states with statutes similar to ours is that the officer selects the test. The noteworthy exception is Utah. At the time of the Utah Supreme Court's first pronouncement on the issue, the Utah implied consent law was substantially similar to ours. It provided that "[a]ny person who operates a motor vehicle in this state shall be deemed to have given ... consent to a chemical test of ... breath, blood, urine *or* saliva for the purpose of determining the alcoholic content of ... blood...." Utah Code Ann. § 41–6–10(a) (1953) (emphasis added). Faced with the same issue that confronts us, the Utah Supreme Court looked only at the provision in question and held that the use of the word "or" suggests that a driver need only consent "to a test of some one of the designated substances, ... [t]hat is of breath, *or* of ... blood, *or* of urine, ... *or* of saliva." *Ringwood v. State*, 8 Utah 2d 287, 333 P.2d 943 (1959). The Court did not discuss the other

section of Utah's driving under the influence provisions or the legislative intent.

The Utah legislature amended the statute in 1959. Two years later, the Court was called upon to determine whether the amendment nullified the holding in *Ringwood.* The amendment provided:

> If such person has been placed under arrest and has thereafter been requested to *submit to any one of the above chemical tests and refuses to submit to such chemical test,* the test shall not be given.

Utah Ann.Code § 41–6–44.10 (1959) (changed language emphasized). The Court held that the amendment had no effect on the *Ringwood* decision. Recognizing that the driver choice determination was by court decision, not statute, the Court concluded:

> If the legislature had intended to change that interpretation it could easily have provided in clear and concise language that the choice of test to be given should devolve upon the officer.

*Bean v. State,* 12 Utah 2d 76, 362 P.2d 750, 751 (1961).

While certainly a reasonable conclusion, we find more persuasive the cases of South Dakota, North Dakota, Iowa, Missouri, Kansas, Michigan, Illinois, New Hampshire, Washington, Idaho, and Alaska. In each of these jurisdictions, an unclear statute has required the court to determine whether the driver or the officer selects the testing method. All have concluded that the officer selects. *See Stensland v. Smith,* 79 S.D. 651, 116 N.W.2d 653, 654 (1962) (administered at direction of officer); *Timm v. State,* 110 N.W.2d 359, 363 (N.D.1961) (test directed by officer); *Gottschalk v. Sueppel,* 258 Iowa 1173, 140 N.W.2d 866, 872 (1966) (request of the officer); *Kiso v. King,* 691 S.W.2d 374, 377 (Mo.1985); *Lee v. State,* 187 Kan. 566, 358 P.2d 765, 769 (1961) (administered at the direction of the officer); *Collins v. Secretary of State,* 384 Mich. 656, 187 N.W.2d 423, 428 (1971) (other interpretation make provisions redundant); *People v. Mankowski,* 28 Ill.App.3d 641, 329 N.E.2d 266, 270 (1975) (provision for additional test after test administered at the direction of a law officer); *Hallet v. Johnson,* 111 N.H. 152, 276 A.2d 926, 927 (1971) (administered at direction of officer); *Green-*

*wood v. Department of Motor Vehicles,* 13 Wash.App. 624, 536 P.2d 644, 647 (1975) (at direction of officer); *State v. Griffiths,* 113 Idaho 364, 744 P.2d 92, 98 (1987) (officer requests test); *Snyder v. State,* 879 P.2d 1025 (Alaska App.1994) (administered at the direction of officer).

Even more similar is the Kansas statute which uses language identical to ours: "administered at the direction of the arresting officer." The Kansas Court rejected the idea that the driver may choose the method of testing noting that few geographic areas have the facilities to administer all of the different tests. *Lee v. State,* 187 Kan. 566, 358 P.2d 765, 769 (1961). Similarly, Michigan's statute uses the phrase "at the request of the police officer." Reasoning an interpretation that gave the driver the option to choose the test would render other provisions of the statute redundant and meaningless, the Michigan Supreme Court deemed the choice to be the officer's. *Collins v. Secretary of State,* 384 Mich. 656, 187 N.W.2d 423, 428 (1971) (provisions regarding hemophiliacs and independent tests would be rendered meaningless by other interpretation).

The North Dakota Supreme Court has emphasized, as we must, that the implied consent statutes do not deprive the accused of a choice. The accused may choose to take the test directed by the officer or may refuse to take the test. If the accused takes a test in which a sample is collected, a separate sample may be procured for additional testing by the accused. Upon refusal to take the test directed by the officer, the accused suffers the loss of a privilege previously conferred by the state, the privilege to operate a motor vehicle for a period of time. *Timm v. State,* 110 N.W.2d 359, 363 (N.D.1971) (decided prior to statutory change giving choice to officer).

■ Thus, we conclude that a statute which provides that a test is to be administered at the direction of a law enforcement officer clearly intends that the officer with knowledge about the available the equipment and facilities shall select the testing method. To construe the statute otherwise would virtually repeal the statute in many cases. It is

unlikely that any police department has all three tests available on site. Hospitals and certified personnel are miles and hours away from some locations. Imperfectly functioning equipment requires officer to have some flexibility in the test they administer. An unoperational intoximeter may require that the driver be given a blood test. An unrelated disaster which has overworked the area hospital may require use of breath testing devices. Granting the driver the option to select the test would in effect allow the accused to defeat the purpose of the statute. "Such a built-in escape hatch" was not likely the intention of the legislature. *Stensland v. Smith*, 79 S.D. 651, 116 N.W.2d 653, 655 (1962).

■ Turner urges us to strictly construe the statute in his favor. That general rule of statutory construction was essential to the Utah Supreme Court's analysis in *Ringwood. Ringwood v. State*, 333 P.2d at 944. Turner's argument ignores the fact that we are not construing a criminal statute, but a statute which confers an administrative penalty. Tenn.Code Ann. § 55–10–406(3) (1995 Supp.). Even criminal statutes in Tennessee are subject only to interpretation in accordance with "the fair import of their terms." Tenn.Code Ann. § 39–11–104 (1991 Repl.).

We decline to construe the statute in a manner that would enable the accused intoxicated driver to void the purposes of the statute, would result in disparate treatment of offenders determined by departmental resources, and would create a range of administrative difficulties. Such a strained construction would be inconsistent with the language of the statute and the legislative intent. Therefore, we affirm the decision of the Court of Appeals and the trial court finding that Turner violated the provisions of the implied consent law and suspending his operator's privileges for six months.

ANDERSON, C.J., and DROWOTA, REID and BIRCH, JJ., concur.