# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### April 15, 2011 Session

## IN RE DECIANDRA M., ET AL.[1]

**Appeal from the Juvenile Court for Williamson County**
**No. 27423      Alfred L. Nations, Judge**

---

**No. M2010-02006-COA-R3-PT - Filed May 4, 2011**

---

Mother and Father appeal the termination of their parental rights to four children. Father's rights were terminated on grounds of abandonment by failure to visit the children within four months prior to the filing of the petition and wanton disregard for the children's safety based on his criminal history; Mother's rights were terminated on grounds of severe child abuse, substantial noncompliance with permanency plans, and persistence of conditions. Finding no error, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which ANDY D. BENNETT, J., and JERRY L. SMITH, SP. J., joined.

Christina Ferrell Daugherty, Franklin, Tennessee, for the appellant, Crystal S.

Francis King, Nashville, Tennessee, for the appellant, Lavondal M.

Robert H. Plummer, Jr., Franklin, Tennessee, as Guardian Ad Litem.

Robert E. Cooper, Jr., Attorney General and Reporter, and Alexander S. Rieger, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

**OPINION**

## I. Factual and Procedural History

The Department of Children's Services ("DCS") instituted this proceeding to terminate parental rights to four children on September 9, 2009. The children were originally placed in DCS custody on October 20, 2008 pursuant to an emergency custody order following an automobile accident. Mother was driving a car containing one other adult and five children; the children were not properly restrained.[2] Mother ran a stop sign and collided with a truck; the adult and one child were killed and Mother and the other children seriously injured. On June 9, 2009, the Juvenile Court declared the children dependent and neglected; Mother appealed that ruling to the Circuit Court and the appeal was pending at the time the proceeding to terminate parental rights was initiated.

The first permanency plan was created on November 8, 2008 and ratified by the court on January 26, 2009; a revised plan of May 1, 2009 was ratified on July 7. Mother participated in the development of each plan and her objections to portions of the plans were heard and overruled by the court when the plans were ratified. At the time the children were placed into DCS custody, Father was incarcerated on a probation violation; the underlying offenses were aggravated burglary and possession of marijuana for resale.

Following a three day trial the court entered an order terminating Father's rights on the grounds of abandonment by failure to visit the children within four months prior to the filing of the petition (Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(i)) and wanton disregard for the children's safety based on his criminal history (Tenn. Code Ann. § 36-1-102(1)(A)(iv)). Mother's rights were terminated on grounds of severe child abuse (Tenn. Code Ann. § 37-1-102(b)(23)); substantial noncompliance with permanency plans (Tenn. Code Ann. §§ 36-1-113(g)(2) and 37-2-403(a)(2)); and persistence of conditions (Tenn. Code Ann. § 36-1-113(g)(3)). Mother and Father appeal.

Mother articulates the following issues for resolution:

1. Whether the Juvenile Court erred by denying Appellant's Motion *in limine* to stay the proceedings of the Juvenile Court or transfer of the case to Circuit Court to simultaneously consider the Petition to Terminate Parental Rights and for Full Guardianship as well as the

---

[2] Mother had been involved in a previous accident in April 2008, again involving children who were not appropriately restrained. No one was seriously injured. After the accident she received restraint seats from DCS.

appeal from the Juvenile Court Referee's finding that the children were abused and neglected children.

2. Whether the Juvenile Court erred in finding that Mother has committed severe child abuse upon the children pursuant to Tenn. Code Ann. Section 37-1-102(b)(23).

3. Whether the Juvenile Court erred in finding that Mother is in substantial noncompliance with the permanency plans.

4. Whether the Juvenile Court erred in finding that the Department of Children's Services made reasonable efforts to reunite the Mother with the children.

5. Whether the Juvenile Court erred in determining that the conditions that led to the removal of the children and other issues which have arisen since the children were placed in custody continue to persist as to Mother.

6. Whether the Juvenile Court erred by finding that it is in the children's best interests for Mother's parental rights to be terminated.

Father raises the following issues:

1. Did the evidence at trial establish a ground for the termination of Miller's parental rights based on abandonment predicated on his allegedly willful failure to maintain regular visitation with his children during the four months immediately preceding the filing of the petition in this case?

2. Did the evidence at trial establish a ground for the termination of Miller's parental rights based on wanton disregard predicated on Miller's criminal history?

## II. Standard of Review

A parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174–75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982); *Hawk v. Hawk*, 855 S.W.2d 573, 579 (1993). Our termination statues identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B., IV*, No. M2004-00999-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. April 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). To support the termination of parental rights, petitioners must prove both the

existence of one of the statutory grounds for termination and that termination is in the child's best interest. *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine,* 79 S.W.3d 539, 546 (Tenn. 2002); Tenn. Code Ann. § 36-1-113(c).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769; *Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Thus, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.*

In light of the heightened standard of proof in these cases, the reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d at 654. As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Id.*

## III. Analysis

### A. Termination of Mother's Parental Rights

#### 1. Mother's motion to stay proceedings

Mother contends that the trial court erred in denying her motion to stay the termination proceedings pending the completion of her appeal of the juvenile court's finding that the children were dependent and neglected or, alternatively, to transfer the termination case to the circuit court "for consideration of all issues." While she acknowledges that dependent and neglect proceedings are separate and distinct from proceedings to terminate parental rights, she argues that going forward with the hearing on the petition to terminate her parental rights deprived her of at least two more months of contact with the children and that this additional contact would have allowed her to improve her parenting skills, thereby complying with the permanency plans at issue in the termination case.

Proceedings to terminate parental rights are carried out pursuant to Chapter 1 of Title 36, Tenn. Code Ann. § 36-1-101, *et seq*.; proceedings to have children declared dependent and neglected are conducted in accordance with Chapter 1 of Title 37, Tenn. Code Ann. § 37-1-101, *et seq*. Consistent with the separate codification, the statutes have different purposes and objectives. Title 36 pertains to domestic relations generally, with the statutes governing termination of parental rights included as part of Chapter 1, governing adoption; the purposes of Part 1 are set forth at Tenn. Code Ann. § 36-1-101. In contrast, Title 37 governs proceedings in juvenile courts, which include proceedings allowing the court to determine whether a child is dependent and neglected, as defined at § 37-1-102(b)(12) and, if so, to determine the appropriate disposition of the child. *See* Tenn. Code Ann. § 37-1-128–129.

As noted, the termination of Mother's rights was based on findings of severe child abuse, substantial noncompliance with permanency plans and persistence of conditions. In its order terminating parental rights, the court did not rely on any finding or order entered in the dependent and neglect proceeding[3] and there is nothing in the record to indicate that going forward with the hearing on termination of her parental rights in any way deprived Mother of the *de novo* review, in the circuit court, of the finding that the children were dependent and neglected. Given the difference in the nature and purposes of the proceedings, the court did not err in denying Mother's motion.[4]

2. Finding of severe child abuse

Tenn. Code Ann. § 37-1-102(b)(23)(A) defines "severe child abuse" in pertinent part as follows:

---

[3] In its order, the court stated:

The Department's grounds for termination of parental rights as to Mother include Severe Abuse by Mother upon the children. As Mother has appealed the adjudication and disposition of the underlying Dependency/Neglect Petition alleging severe abuse, the Magistrate's finding of severe abuse is not final. Therefore, the basis of the ruling that Mother has committed severe child abuse upon the children must be proven anew in this matter by the Department.

The court then proceeded to make factual findings based on evidence in the record that Mother had committed severe child abuse, as defined by Tenn. Code Ann. § 37-1-102(b)(23).

[4] Much of Mother's argument is based on the proposition that staying the termination proceeding or consolidating it with the dependency and neglect proceeding would have allowed her additional time to establish her compliance with the permanency plans. We will discuss the court's finding that she did not substantially comply with the permanency plan later in this opinion.

(A) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause great bodily harm or death and the knowing use of force on a child that is likely to cause great bodily harm or death;

Tenn. Code Ann. § 37-1-102(b)(23)(A). In its order, the court held:

> Mother's actions and inactions resulted in a serious automobile accident, in which all the children received life-threatening injuries. Mother had been involved in a previous automobile accident in April, 2008, at which time she was cited for violations of the child restraint laws and was made aware of the purpose and the requirements of the law at that time. Mother knew or reasonably should have known of her duty to comply with the law, and of the law's requirements and purpose for the usage of child restraint seats. Mother was provided safety seats by the Department but did not properly use them, as three of the children were not restrained properly at the time of the October, 2008 accident. Mother's negligence caused the October, 2008 accident, as Mother ran a clearly visible stop sign and stop signal, making contact with a moving tractor trailer. On October 20, 2008, Mother violated the agreement she had made with the department to have certain of her children in the care of Norma Barker, her grandmother, and ignored warnings of Mrs. Barker that Mother could not place five children safely and lawfully in Mother's vehicle, stating that she "did it all the time."

Mother does not dispute the factual findings of the court, which are fully supported by the record. Construing the statute as requiring findings that she knowingly exposed the children to bodily harm *and* knowingly used force on the children, Mother argues that the record does not support the trial court's finding that Mother committed severe child abuse. We decline to construe the statute in the manner suggested by Mother.

This court's function in construing a statute is "to ascertain and give effect to the intention and purpose of the legislature." *LensCrafters, Inc., v. Sundquist*, 33 S.W.3d 772, 777 (Tenn. 2000); *see also Carson Creek Vacation Resorts, Inc. v. Dept. Of Revenue*, 865 S.W.2d 1, 2 (Tenn. 1993); *Exxonmobil Oil Corp. v. Metro. Gov't of Nashville and Davidson County*, 246 S.W.3d 31, 35 (Tenn Ct. App. 2005); *McGee v. Best*, 106 S.W.3d 48, 64 (Tenn. Ct. App. 2002). To determine legislative intent, one must look to the natural and ordinary meaning of the language used in the statute itself. We must examine any provision within the context of the entire statute and in light of its over-arching purpose and the goals it serves. *State v. Flemming*, 19 S.W.3d 195, 197 (Tenn. 2000); *Cohen v. Cohen*, 937 S.W.2d

823, 828 (Tenn. 1996); *Exxonmobil*, 246 S.W.3d at 35; *T.R. Mills Contractors, Inc. v. WRH Enterprises, LLC*, 93 S.W.3d 861, 867 (Tenn. Ct. App. 2002). The statute should be read "without any forced or subtle construction which would extend or limit its meaning." *Nat'l. Gas Distributors, Inc. v. State*, 804 S.W.2d 66, 67 (Tenn. 1991). As our Supreme Court has said, "[w]e must seek a reasonable construction in light of the purposes, objectives, and spirit of the statute based on good sound reasoning." *Scott v. Ashland Healthcare Ctr., Inc.*, 49 S.W.3d 281, 286 (Tenn. 2001) (citing *State v. Turner*, 913 S.W.2d 158, 160 (Tenn. 1995)). We are "required to construe a statute, or set of statutes, 'so that the component parts are consistent and reasonable.'" and our duty is "to interpret a statute in a manner that makes no part inoperative.*" In re Shelby L. B.,* M2010-00879-COA-R9-PT, 2011 WL 1225567, at *5 (Tenn. Ct. App. Mar. 31, 2011) (citations omitted).

Taking the statute as a whole, and consistent with the general purpose of Chapter 1 of Title 37 to "[p]rovide for the care, protection . . . of children," it is clear that the word "and" in § 37-1-102(b)(23)(A) is not used in the conjunctive, i.e., that both knowing exposure or failure to protect as well as a knowing use of force must be present in order to find "severe child abuse." *See* Tenn. Code Ann. § 37-1-101(a)(1). Rather, a reasonable construction of the statute is that a finding of either will satisfy the statutory definition. This is clear because the "knowing use of force . . . likely to cause great bodily harm or death" referenced in the second clause of the statute by its very nature constitutes knowingly exposing a child or failing to protect a child "from abuse or neglect . . . likely to cause great bodily harm or death" as referenced in the first clause. To hold otherwise would be to render the second clause of § 37-1-102(b)(23)(A) inoperative.

As noted above, Mother does not dispute the factual findings of the court regarding her knowledge of the requirements of the child restraint law and her duty to comply with it, her negligence in causing the October 2008 accident, her disregard of the agreement with DCS that two of her children would be in the care of Norma Barker, and her disregard of Ms. Barker's warnings. Under the facts presented, Mother knowingly exposed her children to neglect which did, in fact, result in the death of one child and bodily harm to the others. Her conduct constituted "severe child abuse" as contemplated by Tenn. Code Ann. § 37-1-102(b)(23)(A).

3. Finding of substantial noncompliance with the permanency plans

The juvenile court found that Mother was not in substantial compliance with the permanency plan requirements in failing to participate in family or individual counseling, attend AA meetings, obtain proper and safe housing or obtain legal income. In her brief, Mother argues that "although the Court may find that she did not comply with all of the requirements of the plan, such noncompliance was not substantial based upon her degree of

noncompliance and the irrelevance of the terms with which she may have failed to comply." Giving due respect to Mother's arguments, her compliance or noncompliance with the several requirements of the plans must be viewed in the context of the entire plan.

The determination that each requirement was reasonable and related to remedying the circumstances which led to the children's removal is the starting point to determine whether she was in substantial non-compliance with the plans. The trial court found, and we agree, that the requirements of the permanency plan were reasonable and related to addressing the conditions which led to the children's removal. The primary goal of the permanency plan for each child was "return to parent" and the testimony was that each requirement of the plan was related to a specific area of concern or need presented. In addressing the issue of Mother's compliance, therefore, we do not view each requirement in isolation, as suggested by Mother, but consider how compliance with each specific requirement achieved compliance with the overall objectives of the permanency plan.

Mere technical noncompliance by itself is not sufficient to justify the termination of parental rights; in order for noncompliance to justify the termination of parental rights, it must be "substantial." *In re S.H.*, No. M2007-01718-COA-R3-PT, 2008 WL 1901118, at *7 (Tenn. Ct. App. Apr. 30, 2008) (no Tenn. R. App. P.11 application filed). Noncompliance with requirements in a permanency plan that are neither reasonable nor related to remedying the conditions that led to the removal of the child from the parent's custody is not relevant for purposes of Tenn. Code Ann. § 36-1-113(g)(2). *Id*. (citing *In re Valentine*, 79 S.W.3d at 548–49). In addition, the parent's degree of noncompliance with a reasonable and related requirement must be assessed. *Id.*

The individual and family counseling were intended to address the grief and trauma caused by the automobile accident, which resulted in the death of one child and substantial injuries to Mother and the other children. The need for alcohol assessment and counseling was indicated by the testimony of the investigating officer of the October 2008 accident, who testified as to the amount of alcohol Mother acknowledged consuming during the twenty-four hours prior to the accident. With regard to Mother's housing situation, testimony by the children's case worker was that, after Mother was released from the hospital after the October 2008 accident, she moved around and was sometimes unavailable; as a consequence, the requirement that Mother secure safe and stable housing was added to the permanency plan.

The trial court found, and Mother concedes, that she did not participate in individual counseling; Mother's sole reason for not participating is that she did not feel it was necessary. Mother's individual counseling, however, was to complement family counseling - in which Mother had participated - to address grief and trauma associated with the

automobile accident. Mother acknowledges that she did not attend AA meetings as required in the permanency plans. She contends that she quit drinking in January 2009 after having a dream in which God told her that she would go to jail if she did not quit drinking and that she did not attend more AA meetings because she was told by other AA members that she did not need to attend because she quit drinking. The case worker testified further that, at the time of trial, Mother was living with her boyfriend in a two bedroom apartment on a week-to-week lease in the boyfriend's name but that the apartment was not large enough for the four children to be returned to Mother.[5] The testimony of Mother with regard to these specific areas was consistent with her testimony that she had a distrust of "the system" based on her interaction with DCS and authorities.

Mother's lack of compliance with the requirements of the permanency plans identified by the trial court was, in light of the purpose of each requirement and the overall objectives of the plan, substantial.[6]

### 4. DCS' efforts at reunification

DCS employees have an affirmative duty to utilize their education and training to assist parents in a reasonable way to address the conditions that led to the child's removal and to complete the tasks stated in the plan. *In re Giorgianna H.*, 205 S.W3d 508, 519 (Tenn. Ct. App. 2006); *In re J.L.E.*, No. M2004-02133-COA-R3-PT, 2005 WL 1541862, at *14 (Tenn. Ct. App. June 30, 2005); *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7 (Tenn. Ct. App. Mar. 9, 2004); *In re D.D.V.*, No. M2001-02282-COA-R3-JV, 2002 WL 225891, at *8 (Tenn. Ct. App. Feb. 14, 2002). Reasonable efforts are statutorily defined as the "exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and family." Tenn. Code Ann. § 37-1-166(g)(1). The factors courts are to use in determining reasonableness include:

> (1) the reasons for separating the parents from their children, (2) the parents' physical and mental abilities, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the

---

[5] The case worker testified that Mother stated at the Foster Care Review Board meeting that she didn't feel comfortable having a lease in her own name because every time she got something "it end[ed] up being taken away."

[6] Mother also contends that for each area in which the court found her to be non-compliant, the court did not make a specific finding as to the relationship between the requirement and the reason the children were brought into custody. In light of the fact that the permanency plans were developed in consultation with Mother and ratified by the court, it was not necessary for the court to make the findings suggested by Mother as part of its determination of Mother's compliance with the plan.

children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*In re Tiffany B.*, 228 S.W.3d 148, 158–59 (Tenn. Ct. App. 2007) (*citing In re Giorgianna H.*, 205 S.W.3d at 519). The reasonableness of the Department's efforts depends upon the circumstances of the particular case. *In re Giorgianna H.*, 205 S.W.3d at 519.

In this case, DCS was faced with the considerable challenge of assisting Mother in reuniting with four children of diverse ages and needs. The record shows that Mother could accomplish tasks with which she agreed but resisted or had excuses for not accomplishing those with which she did not; the efforts expended by DCS were not the determining factor. Mother's argument that "if the court found that she was in substantial noncompliance with any of the actions identified by the Juvenile Court, then the Court should further find that DCS did not make reasonable efforts" at reunification is unavailing. The record clearly and convincingly shows that the DCS workers were conscientious and concerned. As noted above, the primary goal of each child's plan was reunification. Each permanency plan recognized Mother's strengths and the efforts expended by DCS addressed specific areas of concern or need. Tenn. Code Ann. § 37-1-166(g)(1) provides that the health and safety of the child is to be the "paramount concern" in making the determination of reasonable efforts. In consideration of the factors we are to take into account in determining this issue and in light of the "paramount concern" to be given the health and safety of the children, we agree with the trial court that the Department's efforts were reasonable.

### 5. Persistence of conditions

Tenn. Code Ann. § 36-1-113(g)(3) provides as a ground for termination of parental rights:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3). Mother contends that the trial court erred in finding that the conditions which led to the removal of the children from her custody persisted and constituted a ground for termination, as authorized by the statute. While Mother does not specifically take issue with the court's findings that she continued to fail to properly restrain the children in the car and that during visitation periods with the children she behaved inappropriately, had little positive interaction with the children, and failed to implement parenting skills, she asserts that the evidence does not satisfy the statutory requirements.

Taken as a whole, the evidence shows that Mother's situation had not appreciably changed since the children were placed in DCS custody and the prospects for her making the changes in her life necessary to provide a stable, healthy, and safe environment for the children were not promising. While the parenting plans acknowledge Mother's affection for the children, the testimony of Dr. Jillian Sanborne, permanency clinician with Family and Children's Services, who was engaged by DCS to conduct grief and trauma counseling for Mother's oldest daughter, intensive counseling for Mother to help her develop parenting skills and "attachment services" to assist the youngest children in maintaining their bond with Mother, was compelling. Dr. Sanborne testified as to the course of her involvement with the oldest daughter in 2009 and 2010 and her inability, due to Mother's unavailability or distraction, to conduct the counseling with Mother necessary to facilitate Mother's understanding of her needs and the needs of the children. Dr. Sanborne was particularly concerned that Deciandra had become a "parentified child" –that Deciandra had been assigned so much responsibility for seeing to the needs of her siblings that her own development was being stifled and significant emotional needs not being met. The testimony of Dr. Sanborne was significant with reference to the likelihood that the conditions leading to the children's removal would be remedied soon and the necessity of getting the children into a more stable environment. *See* Tenn. Code Ann. § 36-1-113(g)(3)(B)–(C).

6. Best interest of the children

Once a ground for termination has been proven by clear and convincing evidence, the trial court must then determine whether it is the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard. Tenn. Code Ann, § 36-1-113(i) sets out factors for the court to follow in determining the child's best interest; this list of factors is not exhaustive, and the statute does not require every factor to appear before a court can find that termination is in a child's best interest. *See In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *State of Tenn. Dep't of Children's Servs.*

*v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434 at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)).

The trial court cited numerous facts in determining that termination of Mother's parental rights was in the best interest of the children, including: her failure to comply with the requirements of the permanency plans; her failure to make lasting changes in her circumstances; the detrimental effect changing caregivers and physical environment would likely have on the children; and the need to release the children from foster care and the desire of their foster parents to adopt them. The findings of the court are supported by the evidence and are proper considerations in applying Tenn. Code Ann. § 36-1-113(i). The evidence does not preponderate against the trial court's finding that termination of Mother's parental rights was in the children's best interest.

## B.  Termination of Father's Parental Rights[7]

The trial court based the termination of Father's parental rights on wanton disregard of the children's welfare, within the meaning of Tenn. Code Ann. § 36-1-102(1)(A)(iv).[8] Pursuant to this statute, an incarcerated or recently incarcerated parent can be found guilty

---

[7] DCS concedes that the trial court erred in basing its findings of abandonment on the definition at Tenn. Code Ann. § 36-1-102(1)(A)(i) rather than the definition at § 36-1-102(1)(A)(iv) inasmuch as Father was incarcerated during the four months immediately preceding the filing of the petition to terminate his parental rights. Consequently, we will only discuss the second issue presented by Father.

[8] Tenn. Code Ann. § 36-1-102 provides:

(1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child; or

Tenn. Code Ann. § 36-1-102(1)(A)(iv).

of abandonment only if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child. *See In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005).

The evidence of record clearly and convincingly supports the trial court's findings of Father's wanton disregard of the welfare of his children. We do not believe that, in the context of Father's responsibility to his children, his history of criminal behavior is "comparatively insubstantial," as asserted in his brief on appeal; rather, it is indicative of disregard of the needs of his children throughout their lifetimes.[9]  As noted earlier, the primary objective of DCS in the permanency plans was to reunite these children with their parents.  Through the testimony of Mother, Dr. Sanborne and the DCS case worker, there is little, if anything, showing a commitment of Father–before and during the time the children were placed in DCS custody–to the growth and development of his children, such as consistent financial support, insuring that the children had a safe and secure place to live, or addressing their medical and emotional needs and challenges.  While Father seeks to challenge the motives of DCS in instituting this proceeding, he minimizes or disregards the effects of his behavior on their lives and circumstance.

## IV.  Conclusion

For the reasons set forth above, the order of the Juvenile Court is AFFIRMED.

Costs of this appeal are assessed to Mother and Father, equally.

_____
RICHARD H. DINKINS, JUDGE

---

[9] "[P]robation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d .at 867–68 (citations omitted).