IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 19, 2013 Session

# BILLY W. HUFFMAN, ET UX. v. WHITNEY NICHOLE HUFFMAN

**Appeal from the Chancery Court for Loudon County**
**No. 11991      Frank V. Williams, III, Chancellor**

**No. E2012-02164-COA-R3-CV - Filed August 30, 2013**

This appeal arises from a dispute over grandparent visitation. Whitney Nichole Huffman Lewis ("Mother")[1] is the mother of the minor child Isaiah Huffman ("the Child"). Billy W. Huffman and Lora D. Huffman ("the Grandparents," collectively), father and stepmother of Mother, filed a petition in the Chancery Court for Loudon County ("the Trial Court") to establish visitation rights with the Child. The Child had visited often with the Grandparents, but Mother ended the visits after a falling out with Mr. Huffman. Following a trial, the Trial Court denied the Grandparents' petition after finding there was no significant relationship between the Grandparents and the Child and that there was no risk of substantial harm to the Child. The Grandparents appeal to this Court. We find and hold that while the Grandparents and the Child did have a significant existing relationship, the Grandparents failed to prove that cessation of this relationship would pose a danger of substantial harm to the Child. We affirm the judgment of the Trial Court as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed as Modified; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and JOHN W. MCCLARTY, J., joined.

Kristi M. Davis, Knoxville, Tennessee, for the appellants, Billy W. Huffman and Lora D. Huffman.

Keith A. Pope and W. Michael Kilgore, Knoxville, Tennessee, for the appellee, Whitney Nichole Huffman Lewis.

---

[1]Mrs. Lewis was married after the petition was filed and subsequently adopted her present surname.

# OPINION

## Background

In March 2012, the Grandparents filed their petition in the Trial Court to establish their visitation rights to the Child. The petition alleged, among other things, that, since the Child's July 2010 birth, the Grandparents had babysat the Child three to five days per week on average while Mother worked. According to the petition, after an argument between the Grandparents and Mother, Mother had not brought the Child back for normal visits or babysitting. The petition stated that a strong bond existed between the Grandparents and the Child. The petition also set out a proposed visitation schedule. Mother filed an answer in opposition to the petition. In part, Mother denied that there were ever any "normal" overnight visits. Mother also denied that nights were spent at the Grandparents' residence until June 2011. This matter was tried in August 2012.

Mr. Huffman, the Child's grandfather and Mother's father, testified. Mr. Huffman stated that he had been married to Lora D. Huffman for approximately 24 years. Mr. Huffman works at Viskase. Mr. Huffman testified to the circumstances surrounding the birth of the Child. According to Mr. Huffman, Mother came to him with news that she was expecting a child and that the father was a man named Josh Knolls. Mr. Huffman stated that later he learned that Mother did not know who the Child's father was, and that there were two or three possible candidates. Mr. Huffman testified that shortly after August 2010, Mother brought the Child over and the Grandparents "instantly...fell in love with him." According to Mr. Huffman, Mother and the Child would visit three or more days per week and would often spend the night. Mother sometimes would leave the Child with the Grandparents while she pursued a relationship with a Chris Hill. The entirety of Mr. Huffman's testimony affirmed that he saw the Child on a continual basis from August 2010 through March 2012. Mr. Huffman had not seen the Child since March 2012 when this legal controversy erupted.

Mr. Huffman testified regarding an exhibit called "Happy Times with Papaw and Mimi," that consisted of various photos showing the extent of the relationship with the Grandparents and the Child. Mr. Huffman testified that he fed the Child "countless times," that he bathed the Child hundreds of times, and that he had seen Mrs. Huffman hold the Child hundreds of times. As part of the "Happy Times" exhibit, there was a chronology of dates showing the Child's visits to the Grandparents. Mr. Huffman testified to numerous activities and events the Grandparents and the Child had engaged in together. Mr. Huffman stated that he could offer the Child guidance, advice, financial support, and love.

Mr. Huffman and Mother clashed over Mother's current husband, Steven Lewis. Mother and Mr. Lewis had dated at various times over the years. At one point, Mother promised the Grandparents that she would not get involved with Mr. Lewis again. However, Mother did, in fact, see Mr. Lewis again and is now married to Mr. Lewis. Mother and Father had another dispute, and Mother obtained an order of protection against Mr. Huffman which she later dropped. The Grandparents filed their petition when Mother began to limit their visitations with the Child.

Mrs. Huffman, Mother's stepmother and the Child's step-grandmother, testified. Mrs. Huffman stated that she and Mr. Huffman "relished every moment" of time spent with the Child. Mrs. Huffman further stated that, over a year and a half period: "I fell in love with him. The more I got to take care of him, bathe him and clothe him and feed him, I just became closer to him."

Teresa Cotton, a neighbor of the Grandparents, testified. According to Ms. Cotton, Mother started bringing the Child over to the Grandparents' house shortly after he was born. A homemaker, Ms. Cotton stated that she had a view of the Grandparents' driveway and often would see Mother bring the Child to the Grandparents' house. Ms. Cotton visited the Grandparents on occasion and vice versa. Asked about the period between August 2010 and March of 2012, Ms. Cotton testified: "[Mother] was there frequently. She brought [the Child]." Ms. Cotton stated that the Child sometimes seemed reluctant to leave. On cross examination, Ms. Cotton acknowledged that she did not keep a calender of the visits.

Karen Richmond, another neighbor of the Grandparents, testified. Ms. Richmond testified that there was a "very strong bond" between the Child and the Grandparents. As to how often the Child visited the Grandparents, Ms. Richmond testified: "Well, since he was a few months old, I guess I have seen him over there up until after the first of this year. He was there quite a bit."

Christopher Hill, Mother's former boyfriend, testified. Mr. Hill testified that he dated Mother between March 2011 and January 2012. In relevant part, Mr. Hill testified that the Grandparents had a strong bond with the Child. On cross examination, Mr. Hill acknowledged that Mr. Huffman previously had bought him some meals, as well as a Carhartt jacket.

Mother testified. Mother stated that the Grandparents did not attend the birth of the Child although they were invited. As of the date of the Child's birth, Mother's relationship with Mr. Huffman was "nonexistent." Mother stated that the first time she brought the Child to the Grandparents' house was in September 2010, and that she did not

spend the night. After this, Mother stated that she brought the Child to see the Grandparents a couple of times per month.

Mother stated that her mother was the Child's primary babysitter until Mother's mother had surgery in June 2011. After that point, Mother started staying at the Grandparents' house 15 nights per month. Meanwhile, Mother maintained a separate residence where she received her mail. Mother testified that before the Grandparents filed their petition, Mr. Huffman was seeing the Child twice a week.

Mother testified that the Child, now no longer visiting with the Grandparents, is "amazing," "excellent," and "very happy." Mother worked at Hardee's as of trial. Mother is married to Steven Lewis, who has two sons of his own. As for being apart from the Grandparents, Mother stated: "[The Child] don't call them out by name or anything. He don't remember them. He's too young." Mother stated that the Child is "happier than ever." Mother stated that her relationship with Mr. Huffman now is "nonexistent." When asked if the Child got excited when he saw the Grandparents on their visits, Mother testified that the Child is excited to see anyone.

According to Mother, Mr. Huffman verbally abused her over the years. Mother testified that the Grandparents had encouraged the Child to call them mommy and daddy, which "appalled" Mother. Mother stated that she wanted to protect the Child from "emotional damage." Mother testified that the Child spent time with Mr. Huffman for nine months. Mother testified that it would be "devastating" were the petition to be granted, as it would disrupt the Child's church schedule.

Teresa Joan Haun, Mother's mother, testified. According to Ms. Haun, she was the Child's main babysitter from birth until June 2011, when she developed cancer. At that point, the Child began to spend about 15 days per month at Mr. Huffman's house. As to the effect that granting the petition would have on the Child, Ms. Haun testified that Mother would be upset and that the Child gets upset when Mother is upset.

Mr. Lewis, Mother's husband, testified. Mr. Lewis stated that he married Mother in April 2012. Mr. Lewis testified to the living arrangements he and Mother had. Mr. Lewis, Mother, the Child, and Mr. Lewis's two children live in a mobile home, where the Child shares a room with Mr. Lewis's two children. Mr. Lewis testified that the Child is happy and gets along with Mr. Lewis's sons. While Mr. Lewis acknowledged having previously been charged with statutory rape, he stated that the charge had been dropped.

The Trial Court entered an order in October 2012. The Grandparents appealed to this Court. On appeal, it came to our attention that the order reserved the issue of

attorney's fees.  Thus, the order was not final for purposes of appeal.  An amended final order was entered in January 2013.  We quote from it:

**IT IS HEREBY ORDERED, ADJUDGED and DECREED:**

1.   That the maternal grandfather and step-grandmother, Billy and Lora Huffman's Petition for Visitation is dismissed with prejudice.
2.  Costs shall be assessed to the Plaintiffs.
3.  That after the presentation of all evidence and testimony, the court finds that there are no grounds under Tennessee Code Annotated Section 36-6-306 to grant the maternal grandfather and step-grandmother visitation of said child.

Specifically, the Plaintiffs failed to establish the existence of a significant existing relationship with said child for twelve months.  The court further found that the Plaintiffs failed to show that severance of their relationship with said child would result in any danger of substantial harm to the child.  The proof showed that said child is well cared for by his mother Whitney Huffman and her husband.  The court also finds that a child of such a young age is capable of adapting to changes in visitation without significant emotional harm.
4.  The issue of attorney fees, previously reserved by Defendant, is hereby voluntarily withdrawn by Defendant.
5.  There are no further pending or reserved issues in this matter.

The Grandparents timely appeal to this Court.

## Discussion

Though not stated exactly as such, the Grandparents raise one issue on appeal: whether the Trial Court erred in denying their petition for visitation with the Child.

"Parents, ... have a fundamental liberty interest in the care and custody of their children under both the United States and Tennessee Constitutions.  However, this right is not absolute and the State may interfere with parental rights if there is a compelling State interest." *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994) (citations omitted).

In *Smallwood v. Mann*, 205 S.W.3d 358 (Tenn. 2006), our Supreme Court discussed the standard of review in cases involving visitation, including grandparent visitation pursuant to Tenn. Code Ann. § 36-6-306.  According to the Court:

Appellate review of a visitation order is governed by an abuse of discretion standard, with the child's welfare given paramount consideration. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). Review of questions of law, including issues of statutory construction, is de novo with no presumption of correctness attached to the judgment of the trial court. *State v. Tait*, 114 S.W.3d 518, 521 (Tenn. 2003) (citing *Beare Co. v. Tenn. Dep't of Revenue,* 858 S.W.2d 906, 907 (Tenn. 1993); *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn. 1993)).

*Smallwood*, 205 S.W.3d at 361.

In relevant part, the Grandparent Visitation Act, codified at Tenn. Code Ann. § 36-6-306, provides as follows:

(a) Any of the following circumstances, when presented in a petition for grandparent visitation to the circuit, chancery, general sessions courts with domestic relations jurisdiction or juvenile court in matters involving children born out of wedlock of the county in which the petitioned child currently resides, necessitates a hearing if such grandparent visitation is opposed by the custodial parent or parents:

\*\*\*

(2) The child's father or mother are divorced, legally separated, or were never married to each other;

\*\*\*

(6) The child and the grandparent maintained a significant existing relationship for a period of twelve (12) months or more immediately preceding severance of the relationship, this relationship was severed by the parent or parents for reasons other than abuse or presence of a danger of substantial harm to the child, and severance of this relationship is likely to occasion substantial emotional harm to the child.

(b)(1) In considering a petition for grandparent visitation, the court shall first determine the presence of a danger of substantial harm to the child. Such finding of substantial harm may be based upon cessation of the relationship between an unmarried minor child and the child's grandparent if the court determines, upon proper proof, that:

(A) The child had such a significant existing relationship with the grandparent that loss of the relationship is likely to occasion severe emotional harm to the child;

(B) The grandparent functioned as a primary caregiver such that cessation of the relationship could interrupt provision of the daily needs of the child and thus occasion physical or emotional harm; or

(C) The child had a significant existing relationship with the grandparent and loss of the relationship presents the danger of other direct and substantial harm to the child.

(2) For purposes of this section, a grandparent shall be deemed to have a significant existing relationship with a grandchild if:

(A) The child resided with the grandparent for at least six (6) consecutive months;

(B) The grandparent was a full-time caretaker of the child for a period of not less than six (6) consecutive months; or

(C) The grandparent had frequent visitation with the child who is the subject of the suit for a period of not less than one (1) year.

(3) A grandparent is not required to present the testimony or affidavit of an expert witness in order to establish a significant existing relationship with a grandchild or that the loss of the relationship is likely to occasion severe emotional harm to the child. Instead, the court shall consider whether the facts of the particular case would lead a reasonable person to believe that there is a significant existing relationship between the grandparent and grandchild or that the loss of the relationship is likely to occasion severe emotional harm to the child.

\*\*\*

(c) Upon an initial finding of danger of substantial harm to the child, the court shall then determine whether grandparent visitation would be in the best interests of the child based upon the factors in § 36-6-307. Upon such determination, reasonable visitation may be ordered.

Tenn. Code Ann. § 36-6-306 (2010).

> This Court discussed the substantial harm standard in *Ray v. Ray*, stating:
>
> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (discussing the substantial harm standard as applicable to a custody dispute) (footnotes omitted).

First, the statute, to be applicable, requires that visitation be opposed by the custodial parent. The Trial Court did not make a specific finding in its final order that Mother opposed the Grandparents visiting the Child. However, it is clear from the record that Mother does, in fact, oppose the Grandparents visiting the Child.

Much of our analysis under the statute is related to whether a 'significant existing relationship' existed between the Child and the Grandparents. The statute furnishes several definitions of a significant existing relationship. As relevant to this appeal, a significant existing relationship is deemed to exist between a grandparent and grandchild when the "grandparent had frequent visitation with the child who is the subject of the suit for a period of not less than one (1) year." Tenn. Code Ann. § 36-6-306 (b)(2)(C) (2010). The Trial Court found that no significant existing relationship existed between the Grandparents and the Child.

On appeal, the Grandparents argue that the Child had frequent visitation with the Grandparents for 19 months. Mother, on the other hand, only acknowledges frequent visitation for a period of around eight months. From our careful review of the record, it appears that the Grandparents were closely involved with the Child throughout his early life leading up to the dispute leading to this litigation. That visitation may have increased at one point does not mean that it was not frequent throughout. The evidence in the record reflects that the Grandparents were active in the Child's life, be it celebrating holidays or going on trips or feeding the Child or bathing the Child, throughout the relevant period. The parties dispute the length of time for which the visitation was frequent. Mother herself, however, acknowledges that at least eight months of frequent visitation, including staying at the

Grandparents' house 15 nights per month for several months, occurred. It is clear to us from the record that, even if the visitations were uneven or not as frequent at certain times as others, the Child had frequent visitations with the Grandparents for a period of over one year. The evidence preponderates against the Trial Court's finding that no significant existing relationship existed between the Grandparents and the Child.

Our analysis under the grandparent visitation statute, however, is not complete. We are tasked under the statute with now determining whether the Grandparents proved there is a risk of substantial harm to the Child if their relationship with the Child is terminated. As relevant to this case, we must inquire as to whether cessation of that significant existing relationship would cause severe emotional harm or other direct and substantial harm to the child.

This Court discussed statutory construction in *State ex rel. Irwin v. Mabalot*, No. M2004-00614-COA-R3-CV, 2005 WL 3416293 (Tenn. Ct. App. Dec. 13, 2005), *no appl. perm. appeal filed*. We stated:

> The primary rule of statutory construction is "to ascertain and give effect to the intention and purpose of the legislature." *LensCrafters, Inc. v. Sundquist*, 33 S.W.3d 772, 777 (Tenn. 2000). Courts must do so without unduly restricting or expanding a statute beyond its intended scope. *In re C.K.G., C.A.G., & C.L.G.*, 173 S.W.3d 714, 721–22 (Tenn. 2005). To determine legislative intent, one must look to the natural and ordinary meaning of the language used in the statute itself. We must examine any provision within the context of the entire statute and in light of its over-arching purpose and the goals it serves. *State v. Flemming*, 19 S.W.3d 195, 197 (Tenn. 2000); *Cohen v. Cohen*, 937 S.W.2d 823, 828 (Tenn. 1996); *T.R. Mills Contractors, Inc. v. WRH Enterprises, LLC,* 93 S.W.3d 861, 867 (Tenn. Ct. App. 2002). The statute should be read "without any forced or subtle construction which would extend or limit its meaning." *National Gas Distributors, Inc. v. State*, 804 S.W.2d 66, 67 (Tenn. 1991). Statutes relating to the same subject matter or having a common purpose are to be construed together. *In re C.K.G., C.A.G., & C.L.G.*, 173 S.W.3d at 722.

> As our Supreme Court has said, "[w]e must seek a reasonable construction in light of the purposes, objectives, and spirit of the statute based on good sound reasoning." *Scott v. Ashland Healthcare Center, Inc.*, 49 S.W.3d 281, 286 (Tenn. 2001), citing *State v. Turner*, 913 S.W.2d 158, 160 (Tenn. 1995). Courts must look to a statute's language, subject matter, objective or purpose, and the wrong it seeks to remedy or prevent. *In re*

*C.K.G., C.A.G., & C.L.G.*, 173 S.W.3d at 722. Courts are also instructed to "give effect to every word, phrase, clause and sentence of the act in order to carry out the legislative intent." *Tidwell v. Collins*, 522 S.W.2d 674, 676–77 (Tenn.1975); *In re Estate of Dobbins*, 987 S.W.2d 30, 34 (Tenn. Ct. App. 1998). Courts must presume that the General Assembly selected these words deliberately, *Tenn. Manufactured Housing Ass'n. v. Metropolitan Gov't.*, 798 S.W.2d 254, 257 (Tenn. App. 1990), and that the use of these words conveys some intent and carries meaning and purpose. *State v. Levandowski*, 955 S.W.2d 603, 606 (Tenn. 1997); *Tennessee Growers, Inc. v. King,* 682 S.W.2d 203, 205 (Tenn. 1984).

*Mabalot*, 2005 WL 3416293, at *6.

The mere fact that a significant existing relationship exists will not suffice for a showing of substantial harm. If proof that a significant relationship existed is sufficient to show substantial harm to the child if the relationship is terminated, then the General Assembly would not have included the additional language and requirement concerning substantial harm and how to determine if such harm is likely. For this Court to hold otherwise would be, in effect, an improper judicial amendment of this statute. It is the General Assembly's responsibility to establish the public policy of this state with regard to grandparent visitation rights. Our General Assembly has done that and it is this Court's role to construe the statute in order to give effect to the General Assembly's intent. The statute requires the Grandparents to prove not just the existence of a significant relationship with the Child but also that a termination of that significant relationship would pose a danger of substantial harm to the Child.

While the evidence in the record preponderates in favor of a finding of a significant existing relationship, the evidence does not preponderate in favor of a finding that the cessation of this relationship likely would cause substantial harm, of any sort under the statute, to the Child. The Grandparents are correct that expert testimony is not required to prove either the significant existing relationship with the Child or that the termination of that relationship is likely to result in severe emotional harm to the Child. This does not, however, eliminate the requirement under the statute that the Grandparents must prove that termination of the relationship between the Grandparents and the Child is likely to result in substantial harm to the Child. As found by the Trial Court, the Grandparents simply did not present any such proof. We are not unmindful of the fact that the very young age of the Child likely was a critical factor in the Grandparents' inability to present proof that a termination of the relationship likely would result in substantial harm to the Child, but that neither lessens nor eliminates the statutory obligation placed upon the Grandparents to present such proof.

-10-

The evidence reflects that the Child is doing well at present. The Grandparents undeniably care deeply for the Child and want to spend time with him. This, however, is not the standard for interfering with parental rights and awarding grandparent visitation. After a thorough review of the record, including the testimony of all of the witnesses, we find that the evidence does not preponderate against the Trial Court's finding that the Grandparents failed to prove that the Child likely would face substantial harm should his relationship with the Grandparents end.[2]

The judgment of the Trial Court is affirmed except insofar as it found that no significant relationship existed between the Grandparents and the Child, which we modify. We decline to award attorney's fees to either side on appeal.

### Conclusion

The judgment of the Trial Court is affirmed as modified, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellants, Billy W. Huffman and Lora D. Huffman, and their surety, if any.

_____
D. MICHAEL SWINEY, JUDGE

---

[2]Given our holding, we forego a best interest analysis.

-11-